UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

DAISY REYES,                                    :

                    Plaintiff,               :              No.: 1:17-cv-01003 (KAM) (VMS)

      - against -                               :

CROTHALL HEALTHCARE INC.                  :

                Defendant.               :

----------------------------------------------------------------X

**PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1**

Plaintiff DAISY REYES ("Plaintiff" or "Reyes"), by and through her Attorney, NANCY D. WIGLER, ESQ., pursuant to Local Rule 56.1, hereby submits the following in response to the statement of material facts submitted by counsel for Defendant Crothall Healthcare Inc., (hereinafter "Crothall") in support of her opposition to Crothall's motion based on the existence of genuine triable issues of fact with respect to each paragraph enumerated herein unless otherwise stated. In addition, Plaintiff Daisy Reyes ("Reyes") respectfully submits her Counter-Statement of Undisputed Material Facts pursuant to Local Rule 56.1.[1]

**The Accident**

1.      Plaintiff Daisy Reyes ("Plaintiff") slipped and fell while at work, inside a first-

---

1 In preparing its papers, Crothall initially did not refer to deposition excerpts by using the joint appendix designation required by the Court's rules. Counsel for Crothall and Reyes agreed that going forward deposition excerpts for witnesses would be as follows: Reyes Deposition Excerpts Joint Appendix-Exhibit 2; Rossi Deposition Excerpts Joint Appendix-Exhibit 3; and Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 to preserve the sequential numbering of Crothall's exhibits. Joint appendices for deposition excerpts will be filed on ECF. Reyes will use letters for her exhibits.

1

floor hallway at Elmhurst Hospital Center ("Elmhurst") on August 31, 2015, around 12:45 p.m. **Exhibit 1** Plaintiff's Complaint (Dated: January 10, 2017), **p. 1; Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **8:2-14; 19:21-25.**

**Response-** Undisputed.

2.    Plaintiff testified that approximately 15 minutes prior to her fall, she visited a restroom next to the location of her later fall and upon exiting the restroom saw an unidentified, uniformed hospital housekeeper with a mop and bucket who appeared to be preparing to mop. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **25:2-27:18.**

**Response-** Undisputed.

3.    Plaintiff testified the hallway floor after her fall was wet, and Plaintiff believes the wet floor was the result of the mopping because the liquid had a "chemical smell" that Plaintiff associated with mopping. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **29:22-30:24.**

**Response-** Disputed.

Reyes testified that she smelled the cleaning chemicals on her dress which was all wet after her fall. **Reyes Deposition Excerpts Joint Appendix- Exhibit 2 at 30:7-24.**

4.    Plaintiff testified there was no wet floor sign placed in the hallway when she fell. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **30:25-31:9.**

**Response-** Undisputed.

5.     On January 12, 2017, Plaintiff filed a Complaint alleging one count of negligence against Defendant Crothall Healthcare, Inc. ("Crothall"). **Exhibit 1** Plaintiff's Complaint (dated January 10, 2017), **p. 1-2.**

**Response-** Undisputed.   Reyes reserves its right to move to amend the complaint as provided for in the Federal Rules of Civil Procedure.

## The Parties

6.     Plaintiff was, at the time of the accident, employed by New York City Health and Hospitals Corporation ("HHC") and was at work at the time of the underlying accident. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **19:21-20:11.** Plaintiff sought and received workers compensation benefits as a result of this accident. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **53:2-8.**

**Response-** Undisputed.

7.     HHC is a governmental entity that, at the time of the accident, owned and operated Elmhurst Hospital. **Exhibit 5** HHC Contract, **Ex. B-Facilities List**; **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **12:17-20.**

**Response- Disputed.**

Crothall (i) controlled the manner, detail and ultimate result of the housekeeping

3

department's work, (ii) trained, managed and directed said housekeeping employees, (iii) at its own expense purchased and furnished all the equipment and supplies used by the housekeepers (iv) and that said housekeeping staff were "special employees" of Crothall, under New York Law. **See Plaintiff's Counterstatement of Undisputed Material Facts ("CSOF") #49, 63, 81, 82, 83, 84, 97, 98, 99, 100, 102, 108, 109, 114, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 128.**

8.       Crothall entered into a contract with HHC ("HHC Contract") to provide certain management services for HHC's Environmental Services program ("housekeeping" or "housekeepers") at HHC's facilities, including Elmhurst Hospital, and this contract was in effect at the time of the accident. **Exhibit 5** HHC Contract, **p. 2-3 Preliminary Statements and Scope of Services; Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **11:23-12:10.**

**Response-** Undisputed.

### HHC Contract

9.       The housekeeping management services provided by Crothall are set out in the HHC Contract and include that in providing its services Crothall will train, manage, and direct HHC Unionized Employees, in accordance with HHC's policies and procedures. **Exhibit 5** HHC Contract, **§2.4; §2.5; Exhibit A - Scope of Services, par. 1(c); Exhibit B – Facilities List.** The Contract further provides that the services performed by Crothall "shall be at all times subject to the direct and control of the Corporation [HHC]." **Exhibit 5** HHC Contract, **§ 2.3.**

**Response-** Undisputed.

10.      In the HHC Contract, HHC sets out the type and amount of housekeeping

4

services to be performed at its facilities. **Exhibit 5** HHC Contract, **Ex. A-1 – Housekeeping Service Specifications.**

**Response-** Undisputed.

11. Crothall personnel do not perform the housekeeping work at Elmhurst Hospital, nor other HHC facilities. **Exhibit 5** HHC Contract, **Preliminary Statements, p.2.**

**Response-** Disputed.

The term "housekeeping work" does not appear in the preliminary statement for the Contract annexed as Exhibit 5 to Crothall's motion papers.

12. The housekeeping work, including mopping, is performed by unionized housekeeping workers employed directly by HHC, under a separate collective bargaining agreement to which Crothall was not a party. **Exhibit 5** HHC Contract, **§ 2.5; § 3.1; Ex. A – Scope of Services; Ex. A-1 – Housekeeping Service Specifications.**

**Response-** Disputed.

The evidence cited is silent about Crothall not being a signatory to the collective bargaining agreement.

13. Under the Contract, HHC directly employs, uniforms, insures, and pays wages to its housekeeping unionized employees, and the selection and number of housekeepers is controlled by HHC. **Exhibit 5** HHC Contract, **Preliminary Statements (page 2), §§ 2.4, 2.5 and 3.1.** HHC retained the authority to hire, fire, and formally discipline its unionized

housekeepers and did not delegate that authority to Crothall, which can only submit proposals to and confer with HHC regarding staffing changes to be made by HHC. **Exhibit 5** HHC Contract, **Preliminary Statements (page 2), §§ 2.4, 2.5 and 3.1; Ex. A -Scope of Services.**

**Response-** Disputed.

HHC and Crothall were required to work collaboratively to develop and implement the staffing plan. In addition, the goal of the Contract is to reduce the number of housekeepers employed by HHC through Crothall's control, training, management and direction of housekeepers resulting in improved efficiency in performance of housekeeping services. **Exhibit 5 to Crothall's Motion Papers, HHC Contract ¶¶2.5, 2.6.**

The deposition testimony by Crothall's employee establishes that Crothall can recommend firing, discipline, retraining or promoting of HHC housekeepers. In addition, the goal of the Contract was for Crothall to achieve reductions in the number of housekeepers employed by HHC through efficiency in performance of housekeeping services. **CSOF #101, 116.**

14.    The HHC Contract sets out the number of Crothall personnel that will be available to perform the management services at each facility. **Exhibit 5** HHC Contract **§ 2.4.** HHC also controls the selection of Crothall personnel (substitutions of whom require the approval of HHC), and HHC retains the authority to remove or dismiss Crothall management personnel at

the discretion of HHC. **Exhibit 5** HHC Contract, **Preliminary Statements (page 2), §§ 2.4, 2.6, 3.1(a)(i) and Ex. A (Scope of Services), ¶ 1(a).**

**Response-** Disputed.

The evidence cited does not discuss removal of Crothall personnel except that substitutions are to be approved by HHC.

15.     Under the HHC Contract, Crothall is not delegated authority to unilaterally change the number or type of housekeeping services provided under the contract nor the number of HHC housekeepers. HHC can unilaterally change its cleaning schedules, procedures, and number of housekeepers without the consent of Crothall who may only seek a corresponding change in the contract price. **Exhibit 5** HHC Contract, **§§ 2.5; 3.1(b)(i); Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **103:19-104:6; 107:22-109:4.**

**Response-** Disputed.

HHC and Crothall are required to work collaboratively to develop and implement the staffing plan. In addition, the goal of the Contract was for Crothall to achieve reductions in the number of housekeepers employed by HHC through efficiency in performance of housekeeping services. Fonesca, Crothall's, on site supervisor at Elmhurst Hospital at the time of the accident, does not recall anything that is in the Contract and her testimony about what HHC can and cannot do under the Contract is not admissible. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 5 at 91:15-19.**

16.     Under the Contract, Crothall makes purchases of housekeeping supplies and then invoices the amounts to HHC, up to a set amount determined by HHC. **Exhibit 5** HHC Contract, **§ 3.1 (e).**

**Response-** Disputed.

7

The amount for supplies was agreed to by HHC and Crothall in the Contract. HHC could not unilaterally set the amount. **Exhibit 5 to Crothall's motion papers, Contract ¶3.1(e).**

17. Under the Contract, Crothall must obtain the approval of HHC for the purchase of additional equipment, which could belong to and be at the cost of Crothall or HHC, depending on the circumstances. **Exhibit 5** HHC Contract, **§§ 3.1(k)(i) and 3.1(k)(ii).**

**Response-** Disputed.

Crothall mischaracterizes the language in section 3.1 (k) (ii) of the Contract, Exhibit 5 to Defendant's motion papers. Section 3.1 (k) (ii) is silent about purchase and ownership of additional equipment.

18. Not used by Crothall.

19. Under the Contract, Crothall must obtain the agreement/consent of HHC for the purchase of additional equipment, which could belong to and be at the cost of Crothall or HHC depending on the circumstances. **Exhibit 5** HHC Contract, **§§ 3.1(k)(i) and 3.1(k)(ii).**

**Response-** Disputed.

Crothall mischaracterizes the language of section 3.1 (k) (ii) of the Contract. The only statement not disputed is that HHC has to provide prior written agreement for the purchase of additional equipment. Section 3.1 (k) (ii) is silent about purchase and ownership of additional equipment.

20.    Under the Contract, prior housekeeping equipment already at HHC's facilities will continue to be used. **Exhibit 5** HHC Contract, **§ 3.1(e)(5); Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **81:25-82:13.**

**Response-** Disputed.

The Contract provision cited does not support the statement.    The Rossi testimony also does not support the statement.    Rossi did not testify that Crothall was permitted under the Contract to use existing equipment.

## Elmhurst Hospital

21.    Crothall personnel provide management, supervision, and training for HHC's housekeepers at Elmhurst. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **33:6-16; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **13:7-14:2.** Crothall managers did not mop the floors themselves, and the uniformed personnel mopping the floors at Elmhurst were HHC's housekeepers. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **98:5-13**.

**Response-** Disputed in part.

The first statement is not disputed.    The second statement is disputed.    **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 52:5-10; 97:25-98:4.**

22.    HHC personnel at Elmhurst also provide management, supervision, and training to HHC's housekeepers, sometimes in conjunction with Crothall personnel and sometimes independently. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **35:25-36:20; 43:4-12; 66:14-19; 70:8-71:8**; **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **99:4-12.**

**Response-** Disputed.

The excerpts from Rossi's deposition do not support the statement. Rossi testified at his deposition that Crothall (i) managed the cleaning operation at Elmhurst, (ii) supervised and directed the cleaners, (iii) had sole responsibility to schedule when cleaners worked and (iv) prepared duty lists that directed and assigned work on a daily basis to the cleaners. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 27:14-28:24, 39:2-41:20.** Rossi also testified that pursuant to its Contract with HHC, Crothall trained, managed and directed HHC's unionized employees who worked as housekeepers at Elmhurst. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 32:18-23.**

The excerpt from Fonseca's deposition is limited to "training." In addition, Fonseca also testified similar to Rossi. **Pages 23, 32, 36-39, 56.**

The Contract also requires Crothall to manage, train and supervise housekeepers but does not require Crothall to do so in conjunction with HHC personnel. **Exhibit 5 to Crothall's motion papers, Contract Exhibit "A" (1) (c).**

23.     There were five Crothall managers who worked overlapping weekday shifts at Elmhurst. Three people worked 6:00 a.m. to 4:00 p.m., one person working 10:00 a.m. to 7:00 p.m., and one person working 3:00 p.m. to 12:00 a.m. Crothall managers were not present for the overnight housekeeping shifts (12:00 a.m. to 6:00 a.m.) nor weekend shifts, although housekeeping work continued during those times and was overseen by separate HHC housekeeping supervisors. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at

10

**26:20-28:16; Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) **¶ 1; Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **24:10-25:5; 105:8-12; Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) **¶¶ 1-2.**

**Response-** Disputed.

Exhibit G to the Contract requires that Crothall assign seven (7) full time managers to Elmhurst. Exhibit G also does not delineate the hours considered day or evening time. In addition, neither Rossi nor Fonseca testified that they were at Elmhurst Hospital overnight or weekends. Neither Rossi nor Fonseca can have personal knowledge concerning the presence of HHC personnel acting as supervisors. Therefore, the statements are not admissible to prove the facts claimed.

24. At Elmhurst, HHC employed eight or nine additional housekeeping supervisors that also oversaw and directed the work HHC's housekeeping personnel, sometimes in conjunction with Crothall, sometimes independently. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **24:10-25:5, 35:25-36:20, 43:4-12, 66:14-19, 70:8-71:8; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **99:4-12.** HHC housekeeping supervisors were present for all shifts. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) **¶¶ 1-2.**

**Response-** Disputed.

Crothall's manager Fonseca worked without supervision by any HHC supervisor. CSOF # 135. Fonseca even was the "boss" of Sonya, an HHC supervisor and directed the HHC supervisor at Elmhurst hospital. CSOF # 136. If there were problems, Sonya, the HHC supervisor, reported them to Fonseca. CSOF #137. There was a hierarchy at Elmhurst: Jose

Chevalier from Crothall was in charge; Guy Petriello from Crothall reported to Chevalier; Fonseca reported to Petriello and Chevalier; HHC supervisors reported to Crothall. Reyes Counter-statement of Undisputed Facts # 139 ("CSOF #"). Fonseca's affidavit is inconsistent with her deposition testimony.

25.    At Elmhurst, Crothall managers and HHC housekeeping supervisors would split up the work of overseeing the HHC housekeepers when Crothall managers and HHC supervisors were both on duty. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **86:12-14.** HHC housekeeping supervisors spent more time interacting directly with housekeepers and hospital staff than Crothall managers throughout the day. HHC housekeeping supervisors provided more direct instruction and review of housekeeping worker's work than Crothall managers and would do so independently, without consulting with Crothall managers. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶ **2.**

**Response-** Disputed.

See response to Crothall SOF #24 and Reyes CSOF #139. In addition, Fonseca's affidavit is in complete conflict with her deposition testimony.

26.    At Elmhurst, HHC had approximately 153 housekeeping staff to perform housekeeping work, approximately 65 per day shift. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **118:6-9**; **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **43:20-24.**

**Response-** Undisputed.


27.     Crothall and HHC personnel both trained the housekeepers to place wet floor signs on the floor when the floor was wet. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **77:18-22**; **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **37:17-1**

     **Response-** Disputed.

Fonseca testified that Crothall trained the housekeepers.   In fact, Crothall was required by the Contract to prepare training materials and to conduct training which it did daily, weekly, monthly semi-annually and annually.   The purpose of training was to teach housekeepers to clean the Crothall way.   Except for attending training, HHC supervisors did not conduct training. CSOF #63, 81, 82, 83, 84, 98, 99, 100, 108, 116, 120, 121, 123, 124.   Fonseca's affidavit is inconsistent with her deposition testimony.


28.     Crothall and HHC personnel both monitored housekeepers and corrected them if wet floor signs were not placed on wet floors. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **79:5-8, 102:6-14**

     **Response-** Disputed in part.

HHC housekeepers, including the housekeeping supervisors, all reported to Crothall. CSOF # 135, 136, 139


29.     At Elmhurst, HHC's housekeeping supervisors would receive training from both Crothall and HHC. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **87:3-4.**

**Response-** Undisputed.

30.    At Elmhurst, Crothall managers would create work schedules based on the Housekeeping Service Specifications provided by HHC, the number of HHC housekeepers provided by HHC, and in accordance with the policies and procedures of HHC. **Exhibit 5** HHC Contract, **Ex. A – Scope of Services, Ex. A-1 – Housekeeping Service Specifications; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **99:13-100:18.**

**Response-** Disputed.

Crothall has not produced during discovery or on its motion any HHC policies and procedures.   Crothall's witnesses testified at length during depositions about Crothall's sole responsibility to prepare schedules.  This is consistent with Crothall's Contract.  There was a requirement for Crothall to develop a staffing plan and for HHC to approve the plan.  This is distinct from Crothall's sole responsibility to prepare work schedules.  CSOF #56, 62, 97, 116, 119.

31.    At Elmhurst, the housekeeping department personnel, including Crothall managers and HHC housekeeping supervisors and workers, met in each morning in a "huddle" to discuss any specific housekeeping needs for that day at that facility. Crothall managers primarily organized and spoke at the huddle, but HHC supervisors and personnel could also contribute. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **107:17-21.**

**Response-** Disputed in part.

The deposition excerpt does not support the statements except that an HHC supervisor could speak during the "huddles."

14

32.     Routine cleaning of the floors was typically scheduled to be performed during overnight hours, and localized "spot" cleaning was performed as needed or requested during the daytime shifts. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **52:5-13.**

**Response-** Undisputed.

33.     In addition to regularly scheduled housekeeping work, either Crothall or HHC personnel could direct housekeepers to perform work in additional areas as the need arose (such as when spills occurred).   **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **98:20-24. Exhibit 5** HHC Contract, **Ex. A-1 – Cleaning Specifications A and D.**

**Response-** Disputed.

The deposition excerpt does not specify any task that a housekeeper could be instructed to perform by an HHC supervisor.

34.     HHC personnel or other hospital personnel (such as maintenance workers, security personnel, or doctors and nurses) could direct housekeepers to perform work in a specific area or attend to a particular housekeeping need (such as a spill) without consulting with Crothall managers. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **98:20-24; 102:19-103:2; Exhibit 5** HHC Contract, **Ex. A-1 – Cleaning Specifications A and D.; Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶ **3-4.**

**Response-** Disputed.

The deposition excerpt and the affidavit do not support the statements.   Crothall is adding facts that are missing from the evidence to support conclusions.

15

35.     At Elmhurst, HHC maintained separate Maintenance (also referred to as Facilities), Security, and Safety departments, with which Crothall had no role or oversight, and HHC controlled the access of different personnel to different parts of the facility through credentials and security clearance. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶ **3-4.**

**Response-** The statement even if true is not relevant.   Crothall's Contract concerned housekeeping and has nothing to do with HHC's maintenance, security and safety departments.

36.     At Elmhurst, wet floors could be reported through a call center operated by NYCHH personnel. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **106:16-107:3.**

**Response-** Undisputed except as noted below.

The statement of fact is incomplete because if the call is related to housekeeping, Crothall is notified and will instruct the housekeeper to handle the problem.   **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 106:11-107:17.**

37.     At Elmhurst, HHC maintained its own accident reporting system and records. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **50:5-51:6.**

**Response-** Undisputed except as noted below.   The statement of fact is incomplete because the report is provided to Crothall so that Crothall can follow up.   **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 50:5-17.**

38.    Reports of a wet floor may be directed to Crothall managers or could be directed to other HHC or hospital personnel without notice to Crothall. Crothall managers were not notified of every spill or wet floor nor the direction of housekeepers to address them. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) **¶ 4.**

**Response-** Undisputed.

39.    At Elmhurst, wet floor signs were accessible to and could be placed by HHC or hospital personnel in addition to housekeepers. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) **¶ 5.**

**Response-** Disputed.

There is no statement that HHC supervisors placed wet floor signs on their own.

40.    At Elmhurst, Crothall managers received input from non-housekeeping HHC personnel on a daily basis as to additional housekeeping work to be performed. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **33:6-16. Exhibit 5** HHC Contract, **Ex. A-1 Specifications E and F.**

**Response-** Undisputed.

41.    At Elmhurst, areas of the facility are policed by an HHC housekeeper who monitor for housekeeping needs (such as spills or rubbish), and the HHC housekeeper may address those housekeeping needs as they are discovered without communication with Crothall personnel. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **53:14-54:19; Exhibit**

3 Depo of Richard Rossi (Dated: October 27, 2017) at **97:18-98:18.**

**Response-** Undisputed.

42.     At Elmhurst, the first floor where Plaintiff fell was policed at the time by an HHC housekeeper, who could perform housekeeping work as needed without communication with Crothall. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **62:17-63:4; 67:10-13.**

**Response-** Undisputed.

43.     Crothall did not receive a report of Plaintiff's fall or of the floor being wet. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **114:12-16.**

**Response-** Undisputed.

44.     Plaintiff testified she knew Crothall was a housekeeping company but did not know what they did at Elmhurst, did not work with them, and did not know what the HHC Contract with Crothall entailed. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **39:25-41:7.**

**Response-** Undisputed.

## PLAINTIFF'S COUNTER STATEMENT OF UNDISPUTED MATERIAL FACTS

45.   On August 31, 2015, Plaintiff, Daisy Reyes, suffered severe personal injuries as a result of a slip and fall, on water located in the hallway, that occurred while she was working for HHC (at Elmhurst Hospital), in the Nursing Administration Department.   **Complaint at ¶¶6,**

18

**12, Exhibit 1 to Crothall's motion papers.**

46. Reyes's slip and fall was caused when a housekeeping employee (under the direct control of Crothall) who had mopped the floor, neglected to place a cautionary wet floor sign in the area he was mopping.   **Complaint at ¶7, Exhibit 1 to Crothall's motion papers.**

47. Reyes observed this housekeeper approximately 15 minutes prior to her fall when she was using the bathroom adjacent to the area where she later fell.   The housekeeper appeared to be preparing to mop the hallway.   Reyes then returned to her office.   She left her office to go to lunch.   On her way to lunch, Reyes slipped on the wet floor and fell.   There were no wet floor warning signs placed in the hallway.   Reyes clothing was covered with cleaning fluid which she smelled on her clothing.   **Reyes Deposition Excerpts Joint Appendix- Exhibit 2 at 19:21-20:17, 25:2-24, 27:9-21, 29:22-31:17.**

## The Contract

48. On or about November 11, 2001, Crothall entered into a written Contract with HHC that outsourced to Crothall all of HHC's housekeeping services.   **Exhibit 5 to Crothall's motion papers at pg. 2.**

49.   The Contract was in effect at the time of Reyes's accident at Elmhurst Hospital. **Exhibit 5 to Crothall motion papers, Contract at pg. 3 (art. 1); Exhibit B.**

**49.** The Contract states that Crothall will "… assume responsibility for managing [HHC's] Unionized Employees" in the delivery of all housekeeping services for HHC. **Exhibit 5 to Crothall's motion papers, Contract at pg. 2.**

50. The Contract further obligates Crothall to purchase at its expense all supplies and equipment for the performance of housekeeping services. **Exhibit 5 to Crothall's motion papers, Contract at pg. 2.**

51. Crothall agreed to guarantee the maximum cost HHC will pay for housekeeping services including, the costs (i) for housekeepers, (ii) overtime paid to housekeepers, (iii) supplies and equipment and (iv) Crothall's staff, so that HHC would not pay more than the limits set forth in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pgs. 2, 5-13 (art. 3.1).**

52. Crothall agreed to reimburse HHC the amount of overtime costs for housekeepers exceeding the guaranteed cost in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pgs. 8-9 (art.3.1(d)).**

53. Crothall agreed that it would assume existing contracts with third-parties and directly procure all products and services with third-parties to perform the Contract and that the cost of these products and services would not exceed the amount set forth in the Contract. **Exhibit 5 to Crothall's motion papers Contract at pgs. 10-11 (art. 3.1 (e); Exhibit "A" (2); Exhibit "A-**

4").

54. Crothall further agreed that its management fees will not exceed the amounts set forth in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pg. 2.**

55. HHC provided the unionized housekeeping employees to work under Crothall's direction, supervision and control. **Exhibit 5 to Crothall's motion papers, Contract at pg. 3 (art. 4).**

56. Crothall agreed to develop and implement, subject to agreement between HHC and Crothall, a staffing plan to perform the housekeeping services the goal of which was to lower HHC's costs for unionized housekeepers and equipment all subject to the guaranteed prices in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pg. 4 (art. 2.5).**

57. Exhibit A to the Contract details the "Scope of Services" Crothall agreed to perform. **Exhibit 5 to Crothall's motion papers.**

58. Crothall was obligated to meet the housekeeping services listed in Exhibit "A-1" at areas listed in Exhibit "A-2." The frequency of housekeeping services to be performed were also listed in Exhibit "A-1." **Exhibit 5 to Crothall's motion papers, Contract.**

59. The Contract includes nineteen (19) Cleaning Specifications totaling approximately

twenty-eight (28) pages of described duties for identified locations of HHC's facilities. **Exhibit 5 to Crothall's motion papers, Contract, Exhibit A-1.**

60. The Cleaning Specifications do not describe the means and methods for performing housekeeping services.   While damp mopping is listed in multiple portions of the Cleaning Specifications, the Contract is silent on how damp mopping is to be performed. **Exhibit 5 to Crothall's motion papers, Contract, Exhibit A-1.**

61. To perform the required housekeeping services, Crothall agreed to "[t]rain, manage and direct [HHC's] Unionized Employees in the performance of the Services, in accordance with [HHC's] policies and procedures as such shall be made known to Contractor by [HHC]." **Exhibit 5 to Crothall's motion papers, Contract, Exhibit 'A" (1) (c).**

62. Crothall has not included with its motion for summary judgment any HHC policies or procedures documenting that HHC maintained control in how its housekeepers performed services under the control, management and direction of Crothall. **See Crothall motion papers.**

63. Crothall obligated itself to "[p]rovide and maintain training materials to be used in training … [HHC's] Unionized Employees." **Exhibit 5 to Crothall's motion papers, Contract, Exhibit "A" (1) (e).**

64. Crothall was also responsible to "… maintain… time records and furnish… to [HHC] data from which [HHC] can formulate its regular payroll, maintain department budgets." **Exhibit 5 to Crothall's motion papers, Contract, Exhibit "A" (1) (d).**

65. Crothall agreed to "[f]urnish appropriate modules of [its] proprietary software, TeamCoach© … for housekeeping services…". **Exhibit 5 to Crothall's motion papers, Contract, Exhibit "A" (1) (g).**

66. According to Crothall's web site, "TeamCoach is [its] technology platform for maximum productivity.   The detailed analytics produced by TeamCoach provide meaningful use data to correct, teach and train for each frontline associate.   [Crothall] can pinpoint down to the employee/supervisor/area and task performed to focus [its] coaching." **Exhibit A to Reyes's opposition papers.**

67. The Contract also included Crothall's guarantee to improve patient satisfaction with the delivery of housekeeping services.   If patient satisfaction failed to improve by certain agreed to percentages, Crothall agreed to pay a financial penalty to HHC.   **Exhibit 5 to Crothall's motion papers, Contract, Exhibit E.**

### <u>Crothall's Standard Operating Process Manual ("SOP")</u>

68. Crothall's SOP is annexed as **Exhibit B to Reyes's opposition papers.**

69. Crothall's "SOP" was not produced prior to the depositions of Crothall's witnesses. Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 15:3-8.

70. Subsequent to depositions, Crothall produced a copy of its "SOP" which is titled "Environmental Services Standard Operating Process."  **Wigler Declaration, __; exhibit B to Reyes opposition papers.**

71. The purpose of the SOP is "[t]o provide a blueprint for hourly associates to perform their daily cleaning requirements and to ensure that the cleaning specifications identified in the agreement are delegated through written cleaning assignments."  **Exhibit B to Reyes opposition papers at 150.**

72. Examples of duty lists with detailed assignments including mopping floors used by Crothall are included in the SOP.  **Exhibit B to Reyes opposition papers at 151-155.**

73. Each housekeeper is required by Crothall's SOP to sign his/her duty list and a copy is inserted into each housekeeper's file.  **Exhibit B to Reyes opposition papers at 150.**

74. The SOP requires Crothall to prepare schedules on a two-week basis with days/on and days/off for each housekeeper.  **Exhibit B to Reyes opposition papers at 159-161.**

75. The SOP requires Crothall to prepare sign in/sign out sheets on a daily basis that

housekeepers must sign.   **Exhibit B to Reyes opposition papers at 162-165.**

76. Crothall's SOP requires housekeepers to sign out keys and pagers at the start of each shift and to sign in keys and pagers at the end of each shift.   **Exhibit B to Reyes opposition papers at 166-167.**

77. Crothall's SOP requires housekeepers to sign for the receipt of paychecks.   **Exhibit B to Reyes opposition papers at 168-169.**

78. Crothall's SOP requires housekeepers to maintain restroom logs documenting services performed.   **Exhibit B to Reyes opposition papers, at 170-171.**

79. The SOP requires Crothall to follow a written procedure titled "Procedure 3.01: Quality Inspections & High Touch Surface Focus" at least two times each month with each housekeeper.   **Exhibit B to Reyes opposition papers at 195-197.**

80. The SOP requires Crothall to conduct customer surveys and asks its customers to "[r]ate the responsiveness of our staff to your requests."   **Exhibit B to Reyes opposition papers at 198-200.**

81. The SOP requires Crothall to conduct monthly "Communications, help and Training" ("CHAT") meetings that all housekeepers are required to attend.   **Exhibit B to Reyes**

opposition papers at 202-204.

82. The SOP requires Crothall to conduct mandatory annual training, including mopping, for housekeepers and maintains individual housekeeper training records. **Exhibit B to Reyes opposition papers at 205-207.**

83. For new housekeepers, Crothall's SOP also mandates three (3) days of training. **Exhibit B to Reyes opposition papers at 208-210.**

84. On a weekly basis, Crothall's SOP mandates training, including mopping, for housekeepers. **Exhibit B to Reyes opposition papers at 211-213.**

85. Crothall financially rewards housekeepers who meet or exceed "key performance and specific performance measurements." **Exhibit B to Reyes opposition papers at 215-216.**

86. One of Crothall's values is "… to consistent team work in order to achieve collective goals." **Exhibit B to Reyes opposition papers at 224.**

87. Crothall is committed to quality improvement and requires that its "… 'reports are posted and shared with our EVS [housekeepers] staff' so that they can see the results and the progress they are making." **Exhibit B to Reyes opposition papers at 229.**

88. Crothall requires its managers to be committed to and to acknowledge and consider them as long term and dedicated individuals responsible for Crothall's success. **Exhibit B to Reyes opposition papers at 230.**

89. Crothall requires housekeepers without exception to conform to (i) detailed physical appearance standards that include clothing, proper footwear, nail length and hair style, (ii) how to greet patients and other etiquette with patients, (iii) not eat or drink except in cafeterias and break rooms, (iv) be pleasant with other hospital employees but not engage in excessive socializing. **Exhibit B to Reyes opposition papers at 249.**

90. The SOP requires Crothall to purchase all supplies and equipment it approves and provides for the performance of the Contract solely through Crothall's Compass Group system. The supplies and equipment include mops, buckets, wet floor signs. **Exhibit B to Reyes opposition papers at 284-292, 289-291.**

91. The SOP includes "Policy 10.11: General Liability Reporting Process." The following is included in this policy: "When a non-employee (i.e. visitor, patient, customer, etc.) is injured at one of our facilities we must report it immediately to our insurance carrier. There are a variety of reasons this could occur: employee failed to follow procedures; faulty equipment; employee negligence, etc…". **Exhibit B to Reyes opposition papers at 305.**

27

## Crothall's Control Of Housekeeping Employees And Services At Elmhurst

92. On October 27, 2017, Richard Rossi ("Rossi") testified in this action as a witness on behalf of Crothall. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 1.**

93. Rossi at the time of the deposition and the Reyes accident was employed by Crothall as the Regional Director of Operations with an office at 61 Broadway, New York, New York. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 5:11-6:24.**

94. Rossi is "responsible for overseeing the financial and operational performance of all of the facilities within [his] region" *i.e.,* "… manage the managers who manage the particular management operations at each of the facilities." **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 8:13-22.**

95. One of the facilities Rossi visited for his work is Elmhurst Hospital. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 10:24-11:2.**

96. In August 2015, Crothall assigned five (5) individuals to work at Elmhurst including a supervisor, and assistant supervisor, director, assistant director and/or operations managers. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 23:17-24:16.**

97. Crothall (i) managed the cleaning operation at Elmhurst, (ii) supervised and directed the cleaners, (iii) had sole responsibility to schedule when cleaners worked and (iv) prepared

duty lists that directed and assigned work on a daily basis to the cleaners. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 27:20-28:24, 39:2-41:20.**

98. Pursuant to its Contract with HHC, Crothall trained, managed and directed HHC's unionized employees who worked as housekeepers at Elmhurst. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 32:18-23**.

99. In training HHC's employees, Crothall taught them how to clean Crothall's way. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 43:10-44:11**.

100. Training of housekeepers was performed weekly, monthly, semi-annually and annually. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 47:7-23.**

101. Crothall can recommend that housekeepers be disciplined and terminated if a housekeeper is not performing as required by Crothall. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 55:11-21, 65:17-66:13.**

102. Crothall provides all the chemicals for mopping, the mops and buckets and the caution signs for wet floors to the housekeepers. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 63:7-65:22.**

103. Prior to mopping, housekeepers are supposed to put up caution signs when they

wet mop a floor using chemicals. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 77:13-78:9.**

104. The caution signs can be removed when the floor dries after mopping. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 78:10-79:3.**

105. On January 9, 2018, Yulieth Fonseca ("Fonseca") testified at a deposition in this action as a witness on behalf of Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at** 1.

**106.** Fonseca has been employed by Crothall since approximately 2014. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 12:8-10.**

107. Initially Fonseca was hired as an Assistant Director for Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 12:11-15.**

108. As an Assistant Director for Crothall, Fonseca is responsible for how facilities are cleaned including the training of housekeepers and making sure that they follow procedures. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 12:16-13:6.**

109. Fonseca stated that Crothall is responsible for managing all HHC's housekeepers performing housekeeping services. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 13:13-14:2.**

110.    When Crothall hired her, Fonseca underwent "foundations" training by Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 14:3-6.**

111.    "Foundations" training is based on a document titled "SOP" which sets forth Crothall's policies about what was expected of Fonseca in performing her duties on behalf of Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 14:7-15:4.**

112.    Crothall's "SOP" was not produced prior to the depositions of Crothall's witnesses. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 15:5-8.**

113.    Subsequent to depositions, Crothall produced a copy of its "SOP" which is titled "Environmental Services Standard Operating Process**."    Wigler Declaration, __; exhibit "B" to Reyes opposition papers.**

114.    The "SOP" according to Fonseca also details written policies governing the management of HHC housekeepers by Crothall.    **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 15:9-19.**

115.    After completion of training, Fonseca was assigned by Crothall to Elmhurst Hospital until June 12, 2017. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 16:4-14.**

116.    While at Elmhurst Hospital, Fonseca had the title of Assistant Director and was

responsible for daily operations which with respect to management of housekeepers included scheduling work, reporting incidents, attending meetings, training of housekeepers, counseling housekeepers, implementing disciplinary actions against housekeepers, recommending housekeeper suspensions, recommending firing of housekeepers and recommending housekeeper promotions. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 17:5-18:15.**

117.    Crothall provides all the equipment and supplies used by housekeeper to perform housekeeping at Elmhurst Hospital including but not limited to mops, disinfectants for mopping, bins and buckets for mopping, housekeeping carts and warning signs for wet floors. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 21:8-22:14, 56:8-58:2.**

118.    Crothall "provides everything, in regards of the tools" used by housekeepers to mop floors at Elmhurst Hospital. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 22:4-14.**

119.    Crothall prepares the schedules for housekeepers including their vacations, overtime and when and where they work at Elmhurst Hospital. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 22:15-23:11, 58:3-16, 59:16-60:7.**

120.    Crothall instructs, trains and directs each housekeeper on how to perform his/her

duties at Elmhurst Hospital including mopping. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 23:8-17, 32:6-33:5.**

121.    To train housekeepers, Crothall conducts High Profile Cleaning ("HPC") training sessions twice a year.   In groups of ten (10) housekeepers, Crothall instruct them about their responsibilities including how to mop a floor.   Buckets are filled to a specified level.   Prior to mopping, each housekeeper must place at least four (4) to five (5) wet floor signs in a hallway. There is a recommended distance for the placing of wet floor signs.   If an entrance is being mopped, Crothall instructed housekeepers to place a wet floor sign in the door and to mop inside out.   Housekeepers are also trained to not leave an area they have mopped until the floor is dry. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 36:15-39:21, 56:2-23.**

122.    Crothall also provides each housekeeper with written directions for performing work in the form of a spreadsheet.   **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 39:18-21.**

123.    At least once a month, Crothall requires housekeepers to participate in safety meetings conducted by Crothall.   **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 40:6-41:24.**

124. The monthly safety meeting is in addition to a daily "huddle" conducted by Crothall with all housekeepers to discuss safety.  The daily "huddle" is conducted before sixty-five (65) housekeepers go to their assigned areas to perform work at Elmhurst Hospital.  The "daily huddle" is also used to instruct housekeepers to make sure everything is perfect if the government is coming to the hospital.  **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 41:25-43:6, 74:5-75:8.**

125. Crothall also prepares a "duty list" for housekeepers.  The "duty list" is reviewed with housekeepers and it is maintained in Crothall's office at Elmhurst Hospital. The "duty list" details daily responsibilities for housekeepers.  **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 67:25-69:23.**

126. Fonseca stated that the "duty list" is a specific breakdown prepared by Crothall about when and what each housekeeper is required to do.  Crothall goes over the duty list with each housekeeper.  It includes "[w]hat do you do first in the morning.  Seven a.m. you check on your housekeeping cart, make sure the tools are properly there, your spray bottles are labeled.

You have enough supplies, paper towels. Then you start your routine checking the main entrances first, restrooms and then it goes around. It breaks it down by offices." **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 71:22-72:25.**

127. Fonseca's typical day at Elmhurst Hospital started with checking the callout line to determine whether any housekeepers were not coming to work. Fonseca would then check the daily schedule to make sure each area of the Hospital was covered by a housekeeper. Fonseca would then inspect the 6th to 11th floors "to ensure [that] my housekeeper has the right tools. Ensure they have a wet floor sign. Mops, buckets, microfibers, dust pans, brooms, the right chemicals and that everything is labeled." **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 31:15-32:23.**

128. Fonseca did this to make sure that her housekeepers were doing the right thing, properly carrying out their duties and directing necessary cleaning. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 32:9-23.**

129. If Fonseca observed or was told that mopping or cleaning was not performed or incorrectly performed, she would direct housekeepers to perform or correct their work. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 33:6-34:3.**

35

130.    Fonseca would spend an hour on each of her floors. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 34:4-16.**

131.    Crothall's employees responsible for other floors at Elmhurst Hospital would perform the same work Fonseca performed with respect to supervising and managing housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 35:2-36:8.**

132.    Bathrooms at Elmhurst Hospital are mopped early in the morning at least once a day by housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 54:24-55:14.**

133.    Bathrooms are also mopped during the day as needed by housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 55:15-25, 67:17-23.**

134.    On the first floor of Elmhurst Hospital bathrooms are supposed to be checked very five (5) to ten (10) minutes by the assigned housekeeper. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 62:21-63:4.**

135.    No employee from HHC was ever on any floor with Fonseca to watch the housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 79:21-80:2.**

136.   HHC employed supervisors who had the responsibility to make sure that there were supplies for the psychiatric floors (9, 10 and 11) at the hospital.   The HHC supervisor, Sonya, reported to Fonseca from Crothall.   Fonseca was Sonya's "boss" and "directed her." **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 80:3-82:8, 86:2-14.**

137.   Sonya also reported problems to Fonseca. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 86:15-20.**

138.   HHC supervisors also attend the "daily huddles" run by Crothall.   **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 87:5-10.**

139.   Another HHC supervisor took direction from two additional employees (Guy Petriello and Jose Chevalier) of Crothall.   **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 82:9-83:18.**

140.   Crothall's "Duty List" for the date of the accident which would have evidenced the

housekeeper who mopped the floor and/or was responsible for cleaning the hallway where Reyes fell was discarded by Crothall.on duty. **Rossi Deposition Excerpts Joint Appendix- Exhibit 2, 56:19-62:6.**

Dated: June 5, 2018
Great Neck, New York

Respectfully submitted,

NANCY D. WIGLER, ESQ.
ANDREW J. WIGLER, ESQ.
Attorneys for Plaintiff Daisy Reyes
98 Cuttermill Road, Suite 486S
Great Neck, New York 11021
Telephone: (516) 466-4767
Facsimile: (516) 466-2215
greatnecknancy@aol.com

To:   WILLIAM E. VITA, Esq.
      WESTERMAN BALL EDERER MILLER
            ZUCKER & SHARFSTEIN, LLP
      Attorney for Defendant Crothall Healthcare, Inc.
      1201 RXR Plaza
      Uniondale, New York 11556
      Telephone: (516) 622-9200
      Facsimile: (516)622-9212
      wvita@westermanllp.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

DAISY REYES,

                              Plaintiff,

        - against -

CROTHALL HEALTHCARE, INC.,

                              Defendant.

# PLAINTIFF'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS

**ANDREW J. WIGLER, ESQ.**
*Attorney for* Plaintiff-Ex-Husband
98 Cutter Mill Road
Suite 486South
Great Neck, New York 11021
(516) 466-4767

## NOTICE OF ENTRY:

Sir:    Please take notice that the within is a true copy of an Order dated _____, 2018, and having been duly entered in the office of the clerk of the within named Court on _____ 2018.

                              **ANDREW J. WIGLER, ESQ.**
                              98 Cutter Mill Road
                              Suite 486South
                              Great Neck, New York 11021
                              (516) 466-4767

## ACKNOWLEDGMENT OF IN-HAND SERVICE:

In-Hand Service of the within document is hereby acknowledged by the undersigned, on this _____ day of May 2018, at _____ am/pm.

                              _____
                              By:
                              Attorney For Defendant-Ex-Wife