UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

DAISY REYES,                              :

                                                    No.: 1:17-cv-01003-KAM-VMS

                          Plaintiff,      :

        - against -                       :

CROTHALL HEALTHCARE INC.                  :

                          Defendant.      :

-------------------------------------------------------------X

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Nancy D. Wigler, Esq.
Andrew J. Wigler, Esq.
Attorneys for Plaintiff Daisy Reyes
98 Cuttermill Road, Suite 486 S
Great Neck, New York 11021
Telephone: (516)466-4767
Facsimile: (516)466-2215
greatnecknancy@aol.com

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES.................................................................................... iii

PRELIMINARY STATEMENT.............................................................................. 5

COUNTERSTATEMENT OF FACTS.................................................................... 7

LAW AND ARGUMENT....................................................................................... 7

    A.    SUMMARY JUDGMENT STANDARD............................................. 7

    B.    WHERE THE EVIDENCE SHOWS THAT CROTHALL
        EXERCISED SUFFICIENT CONTROL OVER THE WORK
        OF THE HOUSEKEEPERS, THE HOUSEKEEPERS ARE
        CROTHALL'S SPECIAL EMPLOYEES MAKING CROTHALL
        VICARIOUSLY LIABLE FOR NEGLIGENCE AND REQUIRING
        DENIAL OF SUMMARY
        JUDGMENT………………………………………………… 8

    C.    THERE ARE QUESTIONS OF FACT CONCERNING
        CROTHALL'S LAUNCHING A FORCE OR INSTRUMENT
        OF HARM AND CROTHALL ENTIRELY DISPLACING HHC'S
        DUTY TO MAINTAIN REQUIRING DENIAL OF THE
        MOTION FOR SUMMARY JUDGMENT…………………………… 24

    D.    CONCLUSION........................................................................................ 27

# TABLE OF AUTHORITIES

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505 (1986)    7, 13

Brooks v. Chemical Leaman Tank Lines, Inc. 71 A.D. 2d 405, 407,    9, 10
422 N.Y.S. 2d 695, 697 (1st Dept. 1979)

Caldarola v. Calabrese, 298 F.3d 156, 160, 2002 U.S. App. LEXIS    7
15339 (2d Cir. 2002)

Collado v. Crothall Healthcare, Inc., 2017 WL 6502230 (SDNY) (17-cv-3078)    10, 20, 21
(December 15, 2017)

Cronin v. Perry, 244 A.D. 2d 448, 449 (2d Dept. 1991)    8

Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d 136, 773 N.E. 2d    5, 6, 24
485 (2002)

Fialkow v. Mt. Sinai Hosp., et al., No. 162264/2014, Order dated May 14, 2018    20, 23
(N.Y. Sup. Ct.)

Fung v. Japan Airlines Co., Ltd., 9 N.Y.3d , 351, 359 (2007)    6, 14, 23

Gonzales v. Armac Industries, Ltd., 81 N.Y.2d 1, 611 N.E.2d 261 (1993)    8

Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 2001 U.S. App. LEXIS 15480    7
(2D Cir 2001)

Lotz v. Aramark Services, Inc., 98 A.D. 3d 602 (2d Dept. 2012)    10, 12

Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 586-87    7
(1986)

Oumentseva v. Crothall Management, Inc., et al.,    22
2012 NY Slip Op 32354(U), No. 105816/2009,
2012 WL 4086955 (N.Y. Sup. Ct. September 12, 2012.

Oumentseva v. Crothall Facilities Management, Inc., et al.,    20, 22
2013 NY Slip Op 31061(U), No. 105816/2009, 2013 WL 215582
(N.Y. Sup. Ct. May 13, 2013)

iii

Perkins v. Crothall Healthcare, Inc., 148 A.D. 3d 1189 (2d Dept. 2017)                20, 22

Reinitz v. Arc Electrical Construction Co., Inc., 104 A.D.2d 247, 250                 10
(3rd Dept. 1984)

Santorelli v. Crothall Servs. Grp., Inc., 2017 WL 728227 (EDNY)                       10, 11, 12, 13,
(15-cv-978) (Feb. 23, 2017)                                                           20, 21, 23,
                                                                                      25, 26

Sookram v. Crothall Healthcare, Inc., No. 11006/2015, Order dated Nov. 8, 2017    20, 22

Spencer v. Crothall Healthcare, Inc., 38 A.D.3d 527 (2d Dept. 2007)                   12, 20, 21, 22

Thompson v. Grumman Aerospace Corp., 78 N.Y.2d 553, 585 N.E.2d 355 (1991)   6, 9, 12,13,
                                                                                      14, 23

## Statutes

Fed. R. Civ. P 56                                                                     7

New York Workers' Compensation Law 10, 11 and 29(6)                                   5, 8

## PRELIMINARY STATEMENT

Defendant Crothall Healthcare, Inc., ("Defendant" or "Crothall") now moves, pursuant to Fed. R. Civ. Proc. 56, for summary judgment dismissing the complaint on the basis that Plaintiff Daisy Reyes's ("Plaintiff" or "Reyes") exclusive remedy under New York law for the injuries she suffered as a result of her accident of August 31, 2015 while at work, is a claim for benefits under New York's Workers' Compensation law. Crothall contends that even if the housekeeper mopping the floor failed to place a wet floor warning sign to notify individuals of a slippery condition such negligence is not actionable because the housekeeper was not Crothalls "special employee." Crothall argues that it should not bear any vicarious liability to Reyes for the housekeeper's negligence because there is no evidence that it negligently supervised the housekeeper's performance of his/her duties and that Espinal v. Melville Contractors., 98 N.Y.2d 136 (2002) bars this action as a matter of law.

Crothall's motion should be denied as there exists material issues of fact requiring a trial. Evidence in the form of documents and deposition testimony by Crothall's own employees prove that Crothall controlled the housekeepers to such a degree as to turn these employees into Crothall's "special employees." The facts demonstrate that Crothall directed, controlled and trained its "special employees" in every facet related to how and when work was performed. Crothall furnished all the supplies and equipment to the housekeepers. Crothall scheduled where and when housekeepers worked including when the housekeepers worked overtime. Crothall even established a bonus system that financially rewarded "special employees." Crothall  referred to

the housekeepers as "my housekeepers" during depositions. Not only was Crothall paid for its work but it also assumed financial risk if the costs for employees, supplies and equipment exceeded guaranteed maximums. This is not a simple situation where Crothall performed minimal oversight and was paid for its services. Instead, Crothall assumed control by directing and controlling the employees. These facts establish that the employees became Crothall's special employees which under New York law makes Crothall liable for their negligence.

There are also questions of fact as to whether Crothall, through the negligence of its housekeeper launched a force or instrument of harm or by virtue of its contract with the New York City Health and Hospitals Corporation ("HHC"), entirely displaced HHC's duty to maintain the premises safely, thereby exposing it to liability under Espinal. The evidence adduced so far, at a minimum, supports the presence of issues of fact requiring trial.

In considering this motion, the Court should not conclude that which entity signed the paycheck is dispositive. If the signer of the paycheck ends the inquiry, then the New York Court of Appeals' decision in Thompson v. Grumman Aerospace Corp., 78 N.Y.2d 553, 558) (1991), will have no meaning. As recently as 2007, the Court of Appeals reaffirmed its holding in Thompson when it wrote that "… a 'significant' and 'weighty feature' in deciding whether a special employment relationship exists is 'who controls and directs the manner, details and ultimate result of the employee's work'–in other words, who determines 'all essential, locational and commonly recognizable components of the [employee's] work relationship'…". Fung v. Japan Airlines Co., Ltd., 9 N.Y.3d 351, 359 (2007) (quoting Thompson, 78 N.Y. 2d at 558). The evidence in this case is that Crothall, not HHC, controlled, directed and detailed the ultimate result of the housekeepers. As such, Crothall's Motion for Summary Judgment must be denied.

## COUNTER-STATEMENT OF FACTS

The accompanying Local Rule 56.1 Counter Statement of Admissible and Material Facts (hereinafter "CSOF #"), the exhibits and the deposition testimony submitted with the motion and opposition papers, convey the relevant matters that create questions of fact sufficient to deny Crothall's motion.

## LAW AND ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted in favor of a moving party only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any, material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56 (c). The moving party bears the burden of establishing that there is no genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

"A fact is 'material' … if it 'might affect the outcome of the suit under the governing law'," and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party'." Holtz v. Rockefeller & Co. Inc., 258 F. 3d 62, 69 (2d Cir. 2001) (quoting Anderson, 477 U.S. at 248). The Second Circuit has explained, that "[t]he party against whom summary judgment is sought... 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial'." Caldarola v. Calabrese, 298 F.3d

156, 160 (2d Cir. 2002) (quoting <u>Matsushita Elec. Indus. Co.</u> v. <u>Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986).

For the reasons that follow, application of these legal principles and standards to this motion require denying the motion so that Reyes has the opportunity to prove her case in front of a jury and recover for her significant personal injuries.

**B. WHERE THE EVIDENCE SHOWS THAT CROTHALL EXERCISED SUFFICIENT CONTROL OVER THE WORK OF THE HOUSEKEEPERS, THE HOUSEKEEPERS ARE CROTHALL'S SPECIAL EMPLOYEES MAKING CROTHALL VICARIOUSLY LIABLE FOR NEGLIGENCE AND REQUIRING DENIAL OF SUMMARY JUDGMENT**

Under New York State Workers' Compensation Law Sections 10, 11 and 29(6), an injured party who is eligible for and receive workers' compensation benefits may not sue their employer for negligence to recover for a work-related injury. <u>Gonzales</u> v. <u>Armac Industries, Ltd.</u>, 81 N.Y. 2d 1, 8 (1993); <u>Cronin</u> v. <u>Perry</u>, 244 A.D. 2d 448, 449 (2d Dept. 1991). Instead states including New York have established statutory schemes to pay prescribed workers' compensation benefits as the exclusive remedy for persons injured on the job due to their employer's or co-employee's negligence. Employers are able to avoid negligence claims for on the job injuries under this scheme.[1]

---

1 Crothall in its moving memorandum of law ("Crothall MOL") discusses at length issues related to worker's compensation including the interplay between worker's compensation and derivative claims. Crothall MOL at 3-8. Reyes respectfully submits that much of what Crothall argues is not germane to the motion. Reyes will not respond to arguments that are not relevant except to point out that there are a number of misstatements of fact in this portion of the memorandum of law. These include Crothall's footnote 4 on page 4. Crothall has not submitted admissible evidence to support its contention that HHC supervisors worked overnight and weekends at Elmhurst. See Crothall's Statement of Undisputed Facts #23, 24. ("SOF #")

New York courts have extended this scheme by holding that a person can be a general employee of one employer and the "special employee" of another such that the exclusive remedy of workers' compensation may operate as a bar to liability where the negligence of the special employee causes injury to an individual who is not an employee of the same company. Thompson v. Grumman Aerospace Corp., 78 N.Y. 2d 553 (1991). Thompson also held that there are exceptions to bar if there is a surrender of control. Whether control is surrendered is often a question of fact and if demonstrated will support a separate negligence claim even where workers' compensation has been paid to an injured employee. 78 N.Y. 2d at 557.

In Brooks v. Chemical Leaman Tank Lines, Inc., 71 A.D. 2d 405, 407 (1st Dept. 1979), the Appellate Division, First Department explained that:

> "One who is in the general employ of one party may be in the special employ of another despite the fact that the general employer is responsible for the payment of wages, has the power to hire and fire, has an interest in the work performed by the employee, maintains workers' compensation for the employee and provides some, if not all, of the employee's equipment. Relevant in resolving the issue is who controls the employee's manner of working and the tools of the work."

71 A.D. 2d at 407.

Continuing the court in Brooks wrote:

> "A special employee is one who is transferred for a limited time of whatever duration to the service of another. The presumption is that the general employment continues in the absence of clear proof of surrender of control. (citations omitted) The question is frequently one of law. However, where the elements of the employment of the particular work being done bespeak both general and special employment the question is one of fact for the jury (citations omitted)."

Id.

Brooks instructs that even if an employer retains the power to hire and fire, pays the employee and has an interest in the work performed by the employee that same employee can be

the "special employee" of a second company if the second company controls the employee's manner of working and the tools used in performing the work. Brooks also cautions that where the facts surrounding employment have characteristics of general and special employment, there is a question of fact for the jury to decide. Thus, it is proper under New York law to impose liability on a special employer for the negligence of its special employee for injury to another even where there are elements of general employment. Lotz v. Aramark Services, Inc., 98 A.D. 3d 602, 603 (2d Dept. 2012); Reinitz v. Arc Electrical Construction Co., Inc., 104 A.D. 2d 247, 250 (3d Dept. 1984).

Presented with cases to recover for personal injuries due to a special employee's negligence involving Crothall, courts in the Eastern District of New York and the Southern District of New York recently decided two (2) summary judgment motions reaching opposite results. In Santorelli v. Crothall Servs. Grp., Inc., 2017 WL 728227 (EDNY) (15-cv-978) (Feb. 23, 2017), Judge Nina Gershon denied Crothall's motion for summary judgment. In Collado v. Crothall Healthcare, Inc., 2017 WL 6502230 (SDNY) (17-cv-3078) (December 15, 2017), Judge Katherine B. Forrest granted Crothall's motion for summary judgment. Crothall relies on Collado but utterly fails to bring the Santorelli decision to the Court's attention even though the parties and attorneys in this case are identical to those in Santorelli.

In Santorelli, the plaintiff was injured when she slipped and fell at work. The negligence was caused by her fellow employee's failure to place a cautionary wet floor sign in the area being mopped. The court wrote that "… the heart of the pending motion [for summary judgment] does not lie in the facts surrounding the fall. Rather, it concerns the relationship between Eger and Crothall and how this relationship affects Ortega's employment status, which in turn, affects Santorelli's ability to sue Crothall." 2017 WL 728227 * 2. Eger employed the housekeeper but

10

Eger hired Crothall to provide managers to oversee the work of the housekeeper. In reaching its decision to deny summary judgment, Judge Gershon examined the contract between Eger and Crothall but also looked at how Crothall and Eger interacted in the performance of their contract. 2017 WL 728227 * 3. The Contract in Santorelli assigned to Eger the (i) the right to hire, fire and discipline employees at the request of Crothall; (ii) responsibility to pay wages and benefits to its employees; (iii) responsibility to pay employment related taxes and insurance; (iv) furnishing of janitorial equipment used by its employees; (v) all ancillary employee expense; and (vi) right to change services by Crothall if new facilities were opened or existing facilities closed. 2017 WL 728227 * 3.

Crothall was responsible for (i) providing all management personnel; (ii) training, managing and directing the employees in performing housekeeping; (iii) performing all administrative duties related to the employee's work; (iv) providing and maintaining training equipment and material, daily work schedules, standard operational procedures and training manuals; (v) furnishing its proprietary software for the work; (vi) paying wages and benefits to Crothall's own management staff; (v) paying employment related taxes and insurance for its managers; (vi) paying for janitorial supplies and minor equipment; (vii) paying its overhead to perform the contract; (viii) paying the entire start-up cost and (ix) paying to maintain and repair all janitorial equipment. 2017 WL 728227 * 3.

The Contract in Santorelli did not tell the entire story leading the court to consider how Eger and Crothall actually conducted themselves. These facts included (i) Eger maintaining timecards; (ii) Eger employees directly telling Eger housekeepers what to do from time-to-time as well as telling Crothall managers who in turn told the housekeepers; (iii) the housekeeper not being aware that his manager was employed by Crothall; (iv) Crothall's managers having the ability to

11

direct work by housekeepers including mopping up water and placing cautionary wet floor signs as well as discipline and recommend termination of housekeepers; (v) Crothall managers maintaining duty lists and schedules for the housekeepers' daily assignments; and (vi) Crothall managers performing daily inspections. 2017 WL 728227 * 3-4.

Like it now does, Crothall in Santorelli argued that it was entitled to summary judgment based on a decision in Spencer v. Crothall Healthcare, Inc., 38 A.D. 3d 527 (2d Dept. 2007) which granted Crothall's motion on a set of facts it argued were similar to those in Santorelli. 2017 WL 728227 * 5; Crothall Memorandum of Law at 11, 13. Santorelli urged Judge Gershon to deny Crothall's motion relying on a decision in Lotz v. Aramark Servs., Inc., 98 A.D. 3d 602 (2d Dept. 2012) which denied a motion for summary judgment on a set of facts similar to Santorelli's. 2017 WL 728227 * 5. Judge Gershon wrote:

> "Given that these two Second Department decisions have facts analogous to the current case, but point in opposite directions, neither is particularly instructive as to how the New York Court of Appeals would decide this issue. Therefore, I will return to the seminal New York Court of Appeals case in the special employment context for guidance, *Thompson v. Grumman Aerospace Corp.,* 78 N.Y. 2d 553, 557 (1991). Both parties rely on *Thompson* and it was cited approvingly in both *Lotz and Spencer*."

2017 WL 728227 * 6.

In denying Crothall's motion for summary judgment, Judge Gershon found instructive the following from Thompson:

> "… First the court noted that the issue of special employment is usually one of fact. Second, despite ATS paying plaintiff's salary and providing employment benefits (including workers' compensation), the court did not find it to be plaintiff's employer. Most importantly, the essence of *Thompson's* analysis was its focus on who was responsible for the employee at issue. In finding Grumman to be plaintiff's employer, the court emphasized that plaintiff reported to a Grumman supervisor and worked at a Grumman facility pursuant to Grumman directives in furtherance of Grumman's business interests."

2017 WL 728227 * 6.

The court in Santorelli considered the arguments by Santorelli and Crothall. Santorelli argued that (i) the housekeeper was only managed by Crothall; (ii) Crothall trained managed and directed the housekeeper; (iii) Crothall could recommend discipline and termination; (iv) Crothall maintained the duty list; and (v) Crothall conducted safety meetings for housekeepers. Crothall admitted that it managed staff but argued that it did not control the final result of the housekeepers because (i) Eger set the standards for cleanliness and (ii) Eger had policies and procedures Crothall had to satisfy. 2017 WL 728227 * 7-8. These competing facts led the court in Santorelli to conclude that "[t]hese factual disputes make it impossible to say, as a matter of law, that Crothall was not tasked with controlling and directing [the housekeeper employed by Eger]." 2017 WL 728227 * 9.

The plaintiff in Santorelli defeated Crothall's summary judgment motion because the only factor unequivocally in Crothall's favor was Eger paying its housekeeper wages and benefits. No other factor was solely in Crothall's favor. For example, Eger supplied janitorial equipment and Crothall purchased supplies and minor equipment. Eger had the right to hire and fire but Crothall could recommend discipline or termination. While the Eger housekeeper furthered Eger's interest to keep its hospital safe and clean, the housekeeper also furthered Crothall's interest which was to maintain the hospital in a safe and clean manner which is the very nature of Crothall's business. The court could not hold as a matter of law that there was no issue of fact about which entity controlled and directed the housekeepers, the key issue according to the New York Court of Appeals in Thompson. 2017 WL 728227 * 7.

The Santorelli decision provides support to deny Crothall's motion to dismiss Reyes' lawsuit without a trial. Crothall presents even less to this Court than it did in Santorelli. The only

13

undisputed facts Crothall now offers are that HHC employed the housekeepers, paid their base wages before overtime and provided uniforms.  SOF #13.  If the courts only considered which entity employed a worker, paid them or dressed them to the exclusion of all other facts, then there would be no decisions holding that an employee can be both a general and special employee and that a company can be liable for the negligence of its special employee.  Yet this cannot be correct because there are numerous decisions that go behind the payment of wages and uniforms to permit claims of negligence in the circumstances presented by Reyes.  Reyes has raised issues of fact to support her claim that Crothall can be held liable for negligence because it controlled, directed and managed the work including the ultimate result of its work.  Fung v. Japan Airlines Co., Ltd., 9 N.Y.3d at 351 (quoting Thompson at 558); Thompson v. Grumman Aerospace Corp., 78 N.Y.2d at 558.

When HHC entered into the Contract with Crothall it did so to utilize Crothall's expertise for delivery of housekeeping services with the goal of achieving efficiencies including reduction in the cost for housekeeping.  Presumably HHC decided that its own housekeeping supervisors were not able to accomplish these efficiencies.  Rather than keep supervision in-house, HHC chose a new approach and turned over supervision of its housekeepers to Crothall.

The Contract includes numerous provisions evidencing how Crothall controlled, managed and directed housekeepers and housekeeping supervisors.  For example, the Contract states Crothall will "… assume responsibility for managing [HHC's] Unionized Employees" for the performance of housekeeping.  CSOF #49, 55.  Crothall assumed responsibility for the training, management and direction of the housekeepers.  CSOF #61.  Crothall also agreed to furnish and maintain training materials to train housekeepers.  CSOF #63.  In no place does the Contract provide that Crothall will share these responsibilities with HHC housekeeping supervisors.

The Contract also transferred financial risk from HHC to Crothall. For example, Crothall agreed to guarantee HHC's maximum cost for housekeeping including costs for its housekeepers, overtime paid to its housekeepers, housekeeping supplies and equipment and Crothall's staff as well as Crothall's management fees. CSOF #50, 51, 54. The Contract also required that Crothall assume all existing third-party agreements and directly purchase all products and services from third-parties for a sum not to exceed the amount set out in the Contract. CSOF # 53. Significantly, Crothall even agreed to reimburse HHC if the cost of overtime by housekeepers exceeded the amount guaranteed by Crothall. CSOF #52. While base wages are paid by HHC, Crothall agreed to pay a portion of employee overtime which it controls. Crothall even guaranteed that it would improve patient satisfaction with housekeeping services and pay a financial penalty to HHC if the agreed to improvements were not achieved. SOF #67.

The Contract included a Scope of Services and Crothall agreed that it would make certain that these services were performed. CSOF#57, 58, 59. The details for how the services would be performed were not in this scope document. CSOF #60. Crothall agreed to make sure that HHC received what it bargained for which was a clean facility. The details on how to clean were left up to Crothall to achieve.

Crothall also agreed to provide its proprietary software, TeamCoach©. CSOF #65. According to Crothall, "TeamCoach is [its] technology platform for maximum productivity. The detailed analytics produced by TeamCoach provide meaningful use data to correct, teach and train for each frontline associate. [Crothall] can pinpoint down to the employee/supervisor/area and task performed to focus [its] coaching." CSOF #66. TeamCoach demonstrates that Crothall understood that it would not just manage the housekeepers but that it would also micro-manage the housekeepers. A task as simple as emptying a waste basket in an isolated area could be tracked

by Crothall and flagged for correction.  In addition, it is clear that Crothall also understood that the HHC supervisors were also under their purview.  Otherwise why would Crothall management platform include supervisors for coaching.

Though it claims that there were HHC policies and procedures that limited it, Crothall has failed to present them with its motion.  CSOF #62.  This is not surprising because Crothall had its own Standard Operating Process Manual ("SOP") that controlled the delivery of its services and the housekeepers.  CSOF #68.  Though produced after depositions of Crothall's witnesses, Yulieth Fonseca, Crothall's Assistant Director of Operations at Elmhurst Hospital ("Elmhurst") at the time of the accident, testified that the SOP was the basis for her training and that it sets forth the detailed written policies employed by Crothall to manage housekeepers including those at Elmhurst.  CSOF #69, 70, 105, 106, 107, 110, 111, 112, 113, 114, 115.

Review of the SOP provides even more irrefutable evidence that Crothall managed, controlled and directed the housekeepers.  The purpose of the SOP is to delegate to housekeepers the "blueprint" for them to perform the work required by the Contract.  CSOF #71.  The SOP includes examples of these "blueprints" with detailed assignments including mopping.  CSOF #72.  Each housekeeper is required by Crothall to sign his/her "blueprint" and a copy is placed into each housekeeper's file.  CSOF #73.  Crothall's right to put "blueprints" into employee personnel files is another fact demonstrating Crothall's ability to direct, manage and control the housekeepers.

The SOP further requires Crothall to prepare schedules for each housekeeper, for housekeepers to sign in and sign out, for housekeepers to sign out pagers at the start of shifts and sign them back in at the end of shifts and for housekeepers to sign receipts for paychecks.  CSOF #74, 75, 76, 77.  In addition, the SOP regulates the appearance and conduct of housekeepers including proper clothing and footwear, nail length, hair style, how to greet patients and etiquette

16

with patients, to not eat or drink except in cafeterias or designated breakrooms and to be pleasant with other hospital employees but not engage in excessive socializing. CSOF #80. Crothall's control of housekeepers as outlined in the SOP not only evidences Crothall's assumption of control but it also makes sense because Crothall has a financial incentive to make sure it delivers what it promised HHC or risk financial penalties.

The SOP also states that a Crothall value is "… consistent team work in order to achieve collective goals." CSOF #86. It requires that Crothall's reports be posted and shared with "… 'our [Crothall] EVS [housekeeper] staff' so they can see the results and the progress they are making." CSOF #87. Crothall managers are required to be committed to and to acknowledge their housekeepers who are considered long term and dedicated individuals responsible for Crothall's success. CSOF #88. In exchange, Crothall's housekeepers are eligible for financial rewards from Crothall directly if they meet or exceed "key performance and specific performance measurements." CSOF #85.

The SOP evidences that Crothall considered the housekeepers as subject to its control. This is not a situation where Crothall lightly applied its touch to someone else's employees. Instead Crothall occupies the field of housekeeping management. It even goes further by agreeing that it will pay additional moneys to housekeepers who excel for Crothall.

If the documents alone are not sufficient for the Court to deny the motion, then the deposition testimony by Crothall's witnesses during which they admitted to control should end the inquiry. As earlier mentioned, the Contract obligated Crothall to use its own materials to train the housekeepers. Training by Crothall was conducted for new hires as well as on a weekly, monthly, semi-annual and annual basis. CSOF #81, 82, 83, 84, 100, 121, 123, 124. Crothall conducted daily huddles with its housekeepers at Elmhurst before they went to their assigned floors. CSOF

17

#124.

During her deposition, Fonseca described in detail the semi-annual training which she referred to as "High Profile Cleaning" ("HPC"). Training ten (10) housekeepers at a session, Crothall instructed them about their responsibilities including how to mop a floor. Housekeepers were shown to fill the bucket to a specified level and instructed to place four (4) to five (5) wet floor signs in the area being mopped at a recommended distance and to remain until the mopped floor is dry. CSOF #121.

Richard Rossi, Crothall's Regional Director of Operations responsible for Elmhurst at the time of the accident also testified at a deposition. CSOF #92, 93, 95. Rossi is "responsible for overseeing the financial and operational performance of all the facilities within [his] region" and to "… manage the managers who manage the particular management operations at each of the facilities." CSOF # 94. According to Rossi, Crothall trained the housekeepers to clean the Crothall way. CSOF #99. The HHC way of cleaning was not enough for Crothall to deliver the results it promised.

Rossi also testified that Crothall had the right to recommend discipline and termination of housekeepers if they were not working to Crothall's requirements. CSOF #101. Explaining how this worked in practice, Fonseca referred to the housekeepers as "my housekeepers." CSOF # 127. Fonseca testified that she counseled housekeepers, implemented disciplinary actions against housekeepers and recommended the firing of housekeepers as well as promotions. CSOF #116. Going further, Fonseca stated that if she observed a housekeeper not performing or incorrectly performing work, she would direct the housekeeper to perform or correct work. CSOF #129. Fonseca did not consult an HHC housekeeping supervisor before she told the housekeeper how to do his/her work. It takes little to conclude that Crothall had strong business and financial

18

incentives to make certain that housekeepers cleaned the Crothall way and to get rid of housekeepers who were not doing it the Crothall way and that HHC had every reason to listen to Crothall if it wanted to save money.

In moving for summary judgment, Crothall has submitted an affidavit from Fonseca. In this affidavit, she attempts to show that the HHC supervisors are now equal to Crothall's managers, even overshadowing them. The story she tells in her affidavit is in conflict with what she testified to at her deposition.

During her deposition, Fonseca hardly mentioned HHC supervisors and even called the housekeepers "my housekeepers.". Instead, Fonseca was responsible for how facilities were cleaned, to make sure housekeepers followed procedures and to manage all HHC housekeepers. CSOF #108, 109, 116. According to Fonseca, Crothall provided all the equipment and supplies used by housekeepers including wet floor warning signs. CSOF #117, 118. Fonseca prepared housekeeper schedules including when they work, when they work overtime and when they are off. CSOF #119. Fonseca prepared each housekeeper's duty list detailing each housekeeper's daily responsibilities. CSOF #125, 126.

According to Fonseca, she spent at least one (1) hour on each of the six (6) floors she supervised to inspect and make sure that each housekeeper was doing what they were supposed to do. CSOF #127. While Fonseca was on her six (6) floors she never saw a single HHC supervisor. CSOF #130, 135. When asked about HHC supervisors, Fonseca talked about HHC supervisor Sonya. Sonya distributed supplies to psychiatric floors at Elmhurst. However, Sonya reported to Fonseca from Crothall. Fonseca described herself as Sonya's "boss" testifying that she "directed her [Sonya]." CSOF #136. Any other HHC supervisors took direction from two (2) other Crothall managers, Guy Petriello and Jose Chevalier. CSOF #139. Through the Fonseca affidavit,

19

Crothall's attempt to elevate the HHC supervisors has created issues of fact requiring denial of its motion because Fonseca's statements in the affidavit conflict with her deposition testimony.

Reyes has presented numerous factual issues to support denial of Crothall's motion. More issues have now been presented than were discussed and/or relied on by the Santorelli court when it denied Crothall's motion for summary judgement. These factual issues are found in the Contract, Crothall's SOP and Crothall's deposition testimony. They require a trial to decide whether Crothall exercised the control, management and direction sufficient under New York law to hold it responsible for Reyes's injuries.

In moving for summary judgment, Crothall limits itself to who hired and paid housekeepers, who could discipline and fire housekeepers, the presence of HHC supervisors, HHC's right to have Crothall managers removed and the work being performed on HHC property. Crothall ignores all the evidence of its assumption of control at Elmhurst. In addition to the Collado decision, Crothall also relies on New York State court decisions in which it obtained dismissal of claims for negligence. These decisions are: Spencer v. Crothall Healthcare, Inc., 38 A.D. 3d 527 (2d Dept. 2007); Oumentseva v. Crothall Facilities Management, Inc., et al., 2013 NY Slip Op 31061(U), No. 105816/2009, 2013 WL 215582 (N.Y. Sup. Ct. May 13, 2013); Perkins v. Crothall Healthcare, Inc., 148 A.D. 3d 1189 2d Dept. 2017); Sookram v. Crothall Healthcare, Inc., No. 11006/2015, Order dated Nov. 8, 2017; and Fialkow v. Mt. Sinai Hosp., et al., No. 162264/2014, Order dated May 14, 2018 (N.Y. Sup. Ct.) . Review of these decisions, respectfully, should lead the Court to not consider them dispositive of the record now before the Court.

Reyes respectfully submits that the factual issues and supporting evidence now presented to the Court are not as limited as those in Collado, supra. For example, in Collado, Crothall only had three (3) managers on site to supervise 60 to 70 housekeepers. 2017 WL 6502230 * 1. At

20

Elmhurst where Reyes was injured, Collado had at least five (5) managers (though contractually required to have seven (7) managers) to supervise approximately the same number of housekeepers. CSOF #96; Exhibit 5 to Crothall motion papers, Contract at Ex. G. In Collado, the court observed that Crothall's managers supervised HHC's supervisors and the HHC supervisors oversaw the housekeepers. 2017 WL 6502230 * 1. At Elmhurst, Crothall has admitted that it was responsible for everything involving housekeeping and that it told HHC's supervisors what to do. Fonseca testified that she was the "boss" of the HHC supervisors as were the other Crothall managers. Unlike Collado which included evidence from an HHC housekeeper that he was directly supervised by an HHC supervisor and had minimal contact with Crothall's managers, the evidence before the Court leads to the conclusion that the housekeepers were solely supervised by Crothall including HHC's supervisors.

The court in Collado held that the parties' submissions did not raise an issue about surrender of control. 2017 WL 6502230 * 4. The court observed that the evidence in Santorelli was different including that Crothall could recommend discipline or termination and that the employee only reported to Crothall. In reaching its decision, the Collado court wrote "… there is no evidence that Crothall has the power to discipline or recommend termination. Furthermore, there has been clear and uncontroverted evidence that Ortiz [the HHC housekeeper] regularly reported to and was supervised by an HHS employee. Santorelli is plainly distinguishable on these grounds alone." 2017 WL 6502230 * 4. Reyes respectfully submits that her facts are identical to and exceed what the courts in Santorelli and Collado had before them.

The contract and relationship between Crothall and the hospital in Spencer appear far more limited than the facts now before the Court. First the Contract now before the Court is different than the contract in Spencer. Except for a brief discussion about the relationship between the

21

hospital and its employee, there is no discussion about any facts raised by Spencer in opposition to Crothall's motion.  38 A.D. 3d at 528.  The Spencer decision is of extremely limited utility, if any, to decide this motion.

The decision in Oumentseva v. Crothall, is also not helpful to Crothall.  First, it involves a different contract than the Contract between Crothall and HHC.   Second, Crothall supplied the court with an affidavit from the facility's employee that provided the court with facts to support a conclusion that control over him was never surrendered to Crothall.  Plaintiff's attorney failed to challenge this affidavit with its own affidavit or point to anything in the record "suggesting" that control of the employees had been surrendered to Crothall.   In contrast, Reyes has provided the Court with facts from documents and Crothall's own employees establishing that HHC surrendered control to Crothall.[2]

Perkins v. Crothall Healthcare, Inc., 148 A.D. 3d 1189 (2d Dept. 2017), respectfully, is also of limited use.  First there is no factual support in the record now before the Court that the same contract is involved.  Second even if it is the same contract, the facts presented to the Court by Reyes are significantly greater compared to the limited factual discussion in Perkins.  The substantial facts now presented to the Court by Reyes for the reasons previously explained support the necessary surrender of control to Crothall requiring denial of its summary judgment motion.

Crothall also relies on Sookram v. Crothall Healthcare, Inc., No. 11006/2015, Order dated Nov. 8, 2017, to support its motion.  This appears to be a decision form the Supreme Court of the State of New York, Queens County.  It is unreported and not publicly available on the New York State Court web-site.  The Court should not consider this case but even if the Court considers it,

---

2 The decision relied on by Crothall was on a motion to reargue.  Previously the court denied Crothall's motion for summary judgment.  Oumentseva v. Crothall Facilities Management, Inc., et al., 2012 NY Slip Op 32354(U), No. 105816/2009 2012 WL 4086955 (N.Y. Sup. Ct. September 12, 2012).

the court based its decision on who hired and paid the salary of housekeepers as enough to dismiss the complaint and where the work was performed. These are factors but by no means dispositive given the evidence that Crothall assumed control at Elmhurst.

Finally, Crothall argues that the decision in Fialkow v. Mt. Sinai Hosp., et al., No. 162264/2014, Order dated May 14, 2018 (N.Y. Sup. Ct.) supports its motion. This decision is not persuasive let alone dispositive of this motion. There is no evidence that the same contract involved in this action was at issue in Fialkow. In addition, the decision does not discuss the facts, if any, plaintiff presented in opposition to the motion. In opposition to Crothall's present motion, Reyes has raised numerous issues of fact to support her contention that Crothall assumed control of the employees. Finally, who pays wages and benefits and decided to hire, fire and discipline by themselves are not the only factors considered in deciding assumption of control under New York law.

Judge Gershon in Santorelli recognized that whether surrender of control exists is a fact intensive undertaking and that New York appellate decisions could not be relied upon to inform the decision. Instead, the New York Court of Appeals in decisions like Thompson and Fung furnished better precedent for deciding this issue. Who pays the salary by itself or provides the uniform are not sufficient. Instead, the question is "... 'who controls and directs the manner, details and ultimate result of the employee's work'–in other words, who determines 'all essential, locational and commonly recognizable components of the [employee's] work relationship'...". Fung v. Japan Airlines Co., Ltd., 9 N.Y.3d 351, 359 (2007) (quoting Thompson, 78 N.Y. 2d at 558). Measured against this standard, Crothall has failed to show that summary judgment on the issue of surrender of control should be granted because there are factual issues requiring trial.

23

**C. THERE ARE QUESTIONS OF FACT CONCERNING CROTHALL'S LAUNCHING A FORCE OR INSTRUMENT OF HARM AND CROTHALL ENTIRELY DISPLACING HHC'S DUTY TO MAINTAIN REQUIRING DENIAL OF THE MOTION FOR SUMMARY JUDGMENT**

Under New York law, a party to a contract may be held liable in negligence to a third-party under three scenarios: (i) where it launches a force or instrument of harm; (ii) where the injured victim detrimentally relied on the continued performance of its duties; or (iii) where it has entirely displaced the other party's duty to maintain the premises safely. Espinal v. Melville Snow Contractors, Inc., 98 N.Y.2d at 140. The second scenario is not present since Reyes has not stated that she detrimentally relied on Crothall meeting its contractual obligations. The first and third scenarios are present because Crothall in supervising the mopping/cleaning of the floors at Elmhurst launched a force or instrument of harm and entirely displaced HHC's duty to maintain the premises safely. Thus, questions of fact remain as to the first and third criteria requiring denial of defendant's motion under Espinal.

As to the first criterion, it is undisputed that a housekeeper mopped the floor of the hallway just prior to the occurrence. It is also not in dispute that Crothall provided at its sole expense all the supplies and equipment used to mop floors including the wet floor caution signs, mops, buckets and chemicals for mopping floors. It is also undisputed that this housekeeper did not put a "wet floor" sign in the hallway. It is also not in dispute that Crothall was responsible to train, inspect, direct and manage housekeepers. It is also undisputed that Crothall assumed financial risk to perform the Contract including its agreement to pay a portion of overtime. It is not in dispute that Crothall scheduled when and where housekeepers would work. While Crothall now contends that HHC supervisors played a significant role, this contention is not genuine because during

24

depositions Crothall's on-site manager (Fonseca) testified much differently than what is in the affidavit submitted to the Court including that she was the "boss" of the HHC supervisors. These facts demonstrate that disputed issues, at a minimum, exist and that Crothall's summary judgment motion must be denied so that Reyes can convince a jury that Crothall launched a force or instrument of harm when the housekeeper, under its control, mopped the floor but failed to properly place a "wet floor" sign.

In the face of these facts, Crothall argues that it did not launch an instrument of harm. Crothall MOL at 10-17. Much of what Crothall presents revolves around whether the housekeeper's remained under HHC's control as general employees or whether as special employees Crothall assumed control so as to make it vicariously liable. Reyes will not repeat all the facts and argument that appear in this Memorandum of Law in Opposition ("Reyes MOL") that explain why Crothall assumed control of the housekeepers under the Contract and as a result of its conduct in performing the Contract.

There is one point that needs to be made and it is from Judge Gershon's decision in Santorelli. When Crothall's summary judgment motion was denied in Santorelli, the court explained that Crothall mixed up the issue of control and vicarious liability with duty in arguing that it did not launch an instrument of harm. 2017 WL 728227 * 9. Continuing the court in Santorelli held that an issue of fact existed about Crothall launching an instrument of harm because "[u]nder plaintiff's evidence, Ortega launched an instrument of harm creating the wet floor and not putting up a cautionary sign; and Crothall would be vicariously liable for this action if Ortega is found to be its special employee. Accordingly, there is an issue of fact as to whether Crothall owed a duty of care to Santorelli pursuant to this exception." 2017 WL 728227 * 9.

Crothall on this present motion has made the same conflated argument. There is no

25

question that the floor where Reyes fell was mopped and that there was no wet floor warning sign posted. Crothall, nonetheless, contends that Reyes cannot identify who created this dangerous condition even though she testified to seeing a uniformed housekeeper in the same area with a mop and bucket prior to her fall. Crothall MOL at 10. She further testified that she was covered in cleaning fluid after her fall. Crothall, however, did not produce the record that documents the housekeeper assigned to the area where Reyes fell. Though this record was supposed to be maintained during the regular course of business, Crothall threw it out in the garbage. Reyes not being able to identify the housekeeper is a result of Crothall's own failure to maintain the records it was required to maintain. Crothall should not profit from its own failure to preserve evidence that it now seeks to employ as a sword against Reyes' claim for negligence.

Crothall makes an issue about identifying the housekeeper who mopped the floor. There is no question that based on Reyes' testimony it was a Crothall supervised and controlled housekeeper. Does Crothall contend that someone snuck into the hospital, put on a uniform, went to the janitor's closet, got the mop and bucket with water and chemicals, proceeded to mop the floor, failed to put out the wet floor warning signs and left before the floor dried?

As to the third criterion, Crothall entirely displacing HHC's duty to maintain the premises safely, it is respectfully submitted that the terms of the contract between Crothall and HHC, Crothall's own SOP manual and Crothall's managers' deposition testimony evidence that Crothall entirely displaced HHC's duty to maintain the premises in a safe condition. Again, this has been discussed at length and need not be repeated except to point out that Judge Gershon in Santorelli held that the same facts concerning the issue of special employment are relevant to whether there was a total displacement by Crothall of HHC's duty to maintain. 2017 WL 728227 * 9-10. Given such a comprehensive assumption of the duty to maintain the premises, it strains credulity for

26

Crothall to now argue that it had a minor role and HHC continued to play the major role in keeping Elmhurst in a safe condition. Crothall MOL at 18-20. At the very least, a question of fact remains requiring denial of summary judgment.

## D. **CONCLUSION**

Where questions of fact clearly remain as to whether housekeeper was a special employee of Crothall making it vicariously liable for his negligence in failing to place a "wet floor" sign in the hallway where the subject accident took place, whether in doing so Crothall launched a force or instrument of harm and whether Crothall entirely displaced HHC's duty to maintain the subject premises safely, it is respectfully submitted that Crothall's motion for summary judgment must be denied in its entirety.

Dated: June 5, 2018
   Great Neck, New York

         Respectfully submitted,

         _____
         NANCY D. WIGLER, ESQ.
         ANDREW J. WIGLER, ESQ.
         Attorneys for Plaintiff Daisy Reyes
         98 Cuttermill Road, Suite 486S
         Great Neck, New York 11021
         Telephone: (516) 466-4767
         Facsimile: (516) 466-2215
         greatnecknancy@aol.com

To:    WILLIAM E. VITA, Esq.
WESTERMAN BALL EDERER MILLER
    ZUCKER & SHARFSTEIN, LLP
Attorney for Defendant Crothall Healthcare, Inc.
1201 RXR Plaza
Uniondale, New York 11556
Telephone: (516) 622-9200
Facsimile: (516)622-9212
wvita@westermanllp.com