UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

DAISY REYES,                                         No.: 1:17-cv-01003 (KAM) (VMS)

Plaintiff,

- against -                                          **DEFENDANT'S RESPONSE TO
                                                      PLAINTIFF'S
                                                      COUNTER-STATEMENT OF
CROTHALL HEALTHCARE INC.                              UNDISPUTED MATERIAL FACTS**

Defendant.

-------------------------------------------------------------X

Defendant CROTHALL HEALTHCARE, INC. ("Defendant" or "Crothall"), by and

through its Attorney, WILLIAM VITA, pursuant to Local Rule 56.1, hereby submits the following

in reply responses to the Counter-Statement of Undisputed Material Facts submitted by Plaintiff,

pursuant to Local Rule 56.1.

## The Accident

1.      Plaintiff Daisy Reyes ("Plaintiff") slipped and fell while at work, inside a first- floor

hallway at Elmhurst Hospital Center ("Elmhurst") on August 31, 2015, around 12:45 p.m.

**Exhibit 1** Plaintiff's Complaint (Dated: January 10, 2017), **p. 1; Exhibit 2** Depo of Daisy Reyes

(Dated: September 14, 2017) at **8:2-14; 19:21-25.[1]**

**RESPONSE:** Undisputed.

2.      Plaintiff testified that approximately 15 minutes prior to her fall, she visited a

restroom next to the location of her later fall and upon exiting the restroom saw an unidentified,

uniformed hospital housekeeper with a mop and bucket who appeared to be preparing to mop.

**Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **25:2-27:18.**

---

[1]  The parties agreed to retain the original sequential numbering of Crothall's exhibits when
compiling the Joint Deposition Appendix, such that citations to Exhibits 2, 3, and 4 (the
depositions) refer to the exhibits in the Joint Appendix, still using the same exhibit numbers.

**RESPONSE:** Undisputed.

3.      Plaintiff testified the hallway floor after her fall was wet, and Plaintiff believes the wet floor was the result of the mopping because the liquid had a "chemical smell" that Plaintiff associated with mopping. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **29:22-30:24.**

**RESPONSE:** Disputed.

Reyes testified that she smelled the cleaning chemicals on her dress which was all wet after her fall. **Reyes Deposition Excerpts Joint Appendix- Exhibit 2 at 30:7-24.**

**REPLY:** No further reply.

4.      Plaintiff testified there was no wet floor sign placed in the hallway when she fell. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **30:25-31:9.**

**RESPONSE:** Undisputed.

5.      On January 12, 2017, Plaintiff filed a Complaint alleging one count of negligence against Defendant Crothall Healthcare, Inc. ("Crothall"). **Exhibit 1** Plaintiffs Complaint (dated January 10, 2017), **p. 1-2.**

**RESPONSE: Response-** Undisputed. Reyes reserves its right to move to amend the complaint as provided for in the Federal Rules of Civil Procedure.

## The Parties

6.      Plaintiff was, at the time of the accident, employed by New York City Health and Hospitals Corporation ("HHC") and was at work at the time of the underlying accident. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **19:21-20:11.** Plaintiff sought and received workers compensation benefits as a result of this accident. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **53:2-8.**

**RESPONSE:** Undisputed.

2

7.        HHC is a governmental entity that, at the time of the accident, owned and operated Elmhurst Hospital. **Exhibit 5** HHC Contract, **Ex. B-Facilities List; Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **12:17-20.**

**RESPONSE: Disputed.**

Crothall (i) controlled the manner, detail and ultimate result of the housekeeping department's work, (ii) trained, managed and directed said housekeeping employees, (iii) at its own expense purchased and furnished all the equipment and supplies used by the housekeepers (iv) and that said housekeeping staff were "special employees" of Crothall, under New York Law. **See Plaintiff's Counterstatement of Undisputed Material Facts ("CSOF") #49, 63, 81, 82, 83, 84, 97, 98, 99, 100, 102, 108, 109, 114, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 128.**

**REPLY:** Plaintiff's response does not dispute that HHC operated Elmhurst Hospital.  The cited materials reference Crothall's housekeeping management responsibilities under its contract with HHC, but such does not dispute that HHC otherwise operated the facility.  HHC oversaw the overall operation of its facility, including separate maintenance, security, call-in/dispatch center, and safety departments, and HHC employed all housekeepers at Elmhurst as well as additional housekeeping supervisors. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) **Par**. **3-4; Statement of Undisputed Material Fact ("SOF") No. 24, 25, 35, 36, 38, 39, 40 and 41.**   In further brief reply,   HHC and Crothall both provided training to housekeeping personnel (**SOF No. 29**);  the HHC Contract sets out that housekeeping equipment and supplies may be purchased by, paid for by, and/or owned by Crothall or HHC, depending on the circumstances, and HHC must approve new equipment purchases (**SOF 17 and 20**); and HHC and its personnel also oversaw the work of HHC's housekeepers at Elmhurst (**SOF 9** (all services under the Contract

3

"shall be at the at all times subject to the direction and control of the Corporation [HHC]" and "in accordance with Corporation's [HHC's] policies and procedures") and **SOF 22, 24, and 25**)**.**

8. Crothall entered into a contract with HHC ("HHC Contract") to provide certain management services for HHC's Environmental Services program ("housekeeping" or "housekeepers") at HHC's facilities, including Elmhurst Hospital, and this contract was in effect at the time of the accident. **Exhibit 5** HHC Contract, **p. 2-3 Preliminary Statements and Scope of Services; Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **11:23-12:10.**

**RESPONSE:** Undisputed.

### HHC Contract

9. The housekeeping management services provided by Crothall are set out in the HHC Contract and include that in providing its services Crothall will train, manage, and direct HHC Unionized Employees, in accordance with HHC's policies and procedures. **Exhibit 5** HHC Contract, **§2.4; §2.5; Exhibit A - Scope of Services, par. 1(c); Exhibit B — Facilities List.** The Contract further provides that the services performed by Crothall "shall be at all times subject to the direct and control of the Corporation [HHC]." **Exhibit 5** HHC Contract, § **2.3.**

**RESPONSE:** Undisputed.

10. In the HHC Contract, HHC sets out the type and amount of housekeeping services to be performed at its facilities. Exhibit 5 HHC Contract, Ex. A-1 — Housekeeping Service Specifications.

**RESPONSE:** Undisputed.

11. Crothall personnel do not perform the housekeeping work at Elmhurst Hospital, nor other HHC facilities. **Exhibit 5** HHC Contract, **Preliminary Statements, p.2.**

**RESPONSE:** Disputed.

4

The term "housekeeping work" does not appear in the preliminary statement for the Contract annexed as Exhibit 5 to Crothall's motion papers.

**REPLY:** The Contract section by Defendant states "the Corporation [HHC] will continue to employ at its cost 'Unionized Employees' as hereinafter defined, to perform the labor necessary to perform "Environmental Services" as herein defined."

12.   The housekeeping work, including mopping, is performed by unionized housekeeping workers employed directly by HHC, under a separate collective bargaining agreement to which Crothall was not a party. **Exhibit** 5 HHC Contract, § **2.5; § 3.1; Ex. A — Scope of Services; Ex. A-1 — Housekeeping Service Specifications.**

**RESPONSE:** Disputed.

The evidence cited is silent about Crothall not being a signatory to the collective bargaining agreement.

**REPLY:** Plaintiff cites no evidence in support of its dispute of this statement.  Further, the Contract sections cited by Defendant clearly state that HHC's labor agreement with its Unionized Employees predates the contractual relationship between HHC and Crothall.

13.   Under the Contract, HHC directly employs, uniforms, insures, and pays wages to its housekeeping unionized employees, and the selection and number of housekeepers is controlled by HHC. **Exhibit** 5 HHC Contract, **Preliminary Statements (page 2), §§ 2.4, 2.5 and 3.1.** HHC retained the authority to hire, fire, and formally discipline its unionized housekeepers and did not delegate that authority to Crothall, which can only submit proposals to and confer with HHC regarding staffing changes to be made by HHC. **Exhibit 5** HHC Contract, **Preliminary Statements (page 2), §§ 2.4, 2.5 and 3.1; Ex. A -Scope of Services.**

**RESPONSE:** Disputed.

5

HHC and Crothall were required to work collaboratively to develop and implement the staffing plan. In addition, the goal of the Contract is to reduce the number of housekeepers employed by HHC through Crothall's control, training, management and direction of housekeepers resulting in improved efficiency in performance of housekeeping services. **Exhibit 5 to Crothall's Motion Papers, HHC Contract ¶¶2.5, 2.6.**

The deposition testimony by Crothall's employee establishes that Crothall can recommend firing, discipline, retraining or promoting of HHC housekeepers. In addition, the goal of the Contract was for Crothall to achieve reductions in the number of housekeepers employed by HHC through efficiency in performance of housekeeping services. **CSOF #101, 116.**

**REPLY:** The responses and citations of Plaintiff do not dispute Defendant's statements. All of the above statements remain undisputed.  Plaintiff simply states additional facts that HHC and Crothall agreed to work collaboratively and that HHC sought to reduce the number of its employees over time. Crothall does not dispute those additional facts, but nonetheless, HHC retained all the above-described authority over its unionized employees, including ultimate decision making authority regarding the terms of their employment (regardless of proposals by or collaboration with Crothall as to staffing).

14.	The HHC Contract sets out the number of Crothall personnel that will be available to perform the management services at each facility. **Exhibit 5** HHC Contract § **2.4.** HHC also controls the selection of Crothall personnel (substitutions of whom require the approval of HHC), and HHC retains the authority to remove or dismiss Crothall management personnel at the discretion of HHC. **Exhibit 5** HHC Contract, **Preliminary Statements (page 2), §§ 2.4, 2.6, 3.1(a)(i) and Ex. A (Scope of Services), ¶ 1(a).**

**RESPONSE:**  Disputed.

The evidence cited does not discuss removal of Crothall personnel except that substitutions are to be approved by HHC.

**REPLY:** The Contract section cited by Defendants states "the Corporation [HHC] shall have the right to require the replacement of any Contractor [Crothall] employee on Corporation premises whose continued presence, in the opinion of the administrator, is not in the best interest of Corporation, its patients or staff...".

15.    Under the HHC Contract, Crothall is not delegated authority to unilaterally change the number or type of housekeeping services provided under the contract nor the number of HHC housekeepers. HHC can unilaterally change its cleaning schedules, procedures, and number of housekeepers without the consent of Crothall who may only seek a corresponding change in the contract price. **Exhibit 5** HHC Contract, §§ **2.5; 3.1(b)(i); Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **103:19-104:6; 107:22-109:4.**

**RESPONSE:** Disputed.

HHC and Crothall are required to work collaboratively to develop and implement the staffing plan. In addition, the goal of the Contract was for Crothall to achieve reductions in the number of housekeepers employed by HHC through efficiency in performance of housekeeping services. Fonseca, Crothall's on site supervisor at Elmhurst Hospital at the time of the accident, does not recall anything that is in the Contract and her testimony about what HHC can and cannot do under the Contract is not admissible. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 5 at 91:15-19.**

**REPLY:** The testimony cited by Plaitiff does not dispute the statements.  The Contract sections cited by Defendant state that Crothall must submit proposed changes to staffing plans to HHC and does not state that Crothall may implement changes without the concurrence of HHC.

Evidence that the two entities "worked collaboratively" does not dispute the fact that HHC retained the authority to control the work or any changes to the work.  Further, the Contract sections cited by Defendant state that, "[if] the Corporation [HHC] requests that Contractor [Crothall] make substantial increase or decrease in the quantity or quality of housekeeping tasks or other Environmental Services, or the frequency of provision of such services from what is currently provided as part the Corporation's operations.....the Contract Price shall be increased or decreased by the actual resulting increases or decreases...."  Such evidence supports Defendant's statement, and Plaintiff provides no citation to dispute it.   Lastly, that witness Yulieth Fonseca testified she was familiar with the HHC Contract but did not remember anything that was in it (stating her director mainly dealt with the Contract) does not dispute that she was otherwise familiar with the working relationship between HHC and Crothall regarding operations at Elmhurst.

16.     Under the Contract, Crothall makes purchases of housekeeping supplies and then invoices the amounts to HHC, up to a set amount determined by HHC. **Exhibit 5** HHC Contract, **§ 3.1 (e).**

**RESPONSE:** Disputed.

The amount for supplies was agreed to by HHC and Crothall in the Contract. HHC could not unilaterally set the amount. **Exhibit 5 to Crothall's motion papers, Contract ¶3.1(e).**

**REPLY:** Plaintiff does not dispute that HHC reimbursed Crothall for purchases of supplies, up to a set amount.  Plaintiff only disputes Defendant's statement on the grounds that HHC and Crothall included the set amount in their Contract.  However, the same section, paragraph 1, states that the amount may increase or decrease if HHC decides to increase or decrease the amount, quality, or frequency of Environmental Services covered under the Contract.

8

17.     Under the Contract, Crothall must obtain the approval of HHC for the purchase of additional equipment, which could belong to and be at the cost of Crothall or HHC, depending on the circumstances. **Exhibit 5** HHC Contract, §§ **3.1(k)(i) and 3.1(k)(ii).**

**RESPONSE:** Disputed.

Crothall mischaracterizes the language in section 3.1 (k) (ii) of the Contract, Exhibit 5 to Defendant's motion papers. Section 3.1 (k) (ii) is silent about purchase and ownership of additional equipment.

**REPLY:** The Contract section cited by Defendant specifically sets out that HHC must approve additional equipment purchases and that ownership will transfer from Crothall to HHC upon full amortization over 3-years or upon full payment from HHC to Crothall, depending on the circumstances.

18.     Not used by Crothall.

19.     Under the Contract, Crothall must obtain the agreement/consent of HHC for the purchase of additional equipment, which could belong to and be at the cost of Crothall or HHC depending on the circumstances. **Exhibit 5** HHC Contract, §§ **3.1(k)(i) and 3.1(k)(ii).**

**RESPONSE:** Disputed.

Crothall mischaracterizes the language of section 3.1 (k) (ii) of the Contract. The only statement not disputed is that HHC has to provide prior written agreement for the purchase of additional equipment. Section 3.1 (k) (ii) is silent about purchase and ownership of additional equipment.

**REPLY:** 17 and 19 are duplicative, and the same reply applies.

20.	Under the Contract, prior housekeeping equipment already at HHC's facilities will continue to be used. **Exhibit 5** HHC Contract, § **3.1(e)(5); Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **81:25-82:13.**

**RESPONSE:** Disputed.

The Contract provision cited does not support the statement. The Rossi testimony also does not support the statement. Rossi did not testify that Crothall was permitted under the Contract to use existing equipment.

**REPLY:** The Contract section cited by Defendants states that an inventory of HHC's Environmental Services shall be taken and then compared to a similar inventory at the termination of the agreement, with the parties to exchange an appropriate corresponding sum at that time. Further, Richard Rossi testified that an EVS cart (used by housekeepers for general housekeeping work, including mopping) could be a pre-existing cart HHC had at the facility when the Contract began or could be purchased by Crothall under the Contract subsequently.   Plaintiff does not dispute this evidence with contrary evidence.

### Elmhurst Hospital

21.	Crothall personnel provide management, supervision, and training for HHC's housekeepers at Elmhurst. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **33:616; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **13:7-14:2.** Crothall managers did not mop the floors themselves, and the uniformed personnel mopping the floors at Elmhurst were HHC's housekeepers. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **98:5-13.**

**RESPONSE:** Disputed in part.

The first statement is not disputed. The second statement is disputed. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 52:5-10; 97:25-98:4.**

10

**REPLY:** The Contract and witness testimony in this case is clear that Crothall provided management services but did perform the actual housekeeping duties. Plaintiff attempts to manufacture a dispute of fact where none exists by citing to one answer in which the witness refers to when "we" do the mopping (but does not state that Crothall personnel physically perform the task) and a second where the witness clearly misspoke or misunderstood the question, as set out in the immediately subsequent follow-up questions and testimony cited by Defendant in support of the original statement. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **98:5-13** ( Q. They would pick up a mop and mop? A. No. The managers would never pick up a mop. It's the housekeepers from HHC. Q. Uniformed employees that had mops that were that were mopping the floor, where they Crothall employees or HHC employees? A. They're HHC employees).

22.     HHC personnel at Elmhurst also provide management, supervision, and training to HHC's housekeepers, sometimes in conjunction with Crothall personnel and sometimes independently. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **35:25-36:20; 43:4-12; 66:14-19; 70:8-71:8; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **99:4-12.**

**RESPONSE:** Disputed.

The excerpts from Rossi's deposition do not support the statement. Rossi testified at his deposition that Crothall (i) managed the cleaning operation at Elmhurst, (ii) supervised and directed the cleaners, (iii) had sole responsibility to schedule when cleaners worked and (iv) prepared duty lists that directed and assigned work on a daily basis to the cleaners. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 27:14-28:24, 39:2-41:20.** Rossi also testified that pursuant to its Contract with HHC, Crothall trained, managed and directed HHC's unionized

11

employees who worked as housekeepers at Elmhurst. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 32:18-23.**

The excerpt from Fonseca's deposition is limited to "training." In addition, Fonseca also testified similar to Rossi. **Pages 23, 32, 36-39, 56.**

The Contract also requires Crothall to manage, train and supervise housekeepers but does not require Crothall to do so in conjunction with HHC personnel. **Exhibit 5 to Crothall's motion papers, Contract Exhibit "A" (1) (c).**

**REPLY:** In the testimony cited by Defendant, Mr. Rossi clearly testifies that HHC personnel also provided training and supervision of the HHC's housekeepers at Elmhurst, sometimes in conjunction with Crothall and sometimes independently.  None of the additional citations from Plaintiff dispute Defendant's statements.  Crothall does not dispute that it also provided management and training, but it did not so to the exclusion of HHC's personnel.  There is no dispute of fact on this point, Plaintiff merely cites to testimony where witnesses discuss Crothall while ignoring the testimony where the same witnesses discuss HHC.  Such is exemplified in the exchanges of counsel early in the deposition of Fonseca, wherein Plaintiff's counsel repeatedly cuts off the witness when the witness begins to discuss HHC's involvement at Elmhurst, tells the witness repeatedly that Plaintiff's counsel is not intending to ask about HHC and is only asking about Crothall, and instructs the witness not to include information about HHC in response to the questions. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **13:7-20 and 18:4-21:7** (including a lengthy discussion between counsel as to the appropriateness of asking the witness to limit her answers so as to not include information about HHC, and Plaintiff's counsel making it explicitly clear that the questions are intended to only ask about Crothall and only seek answers discussing Crothall and not HHC).

12

23. There were five Crothall managers who worked overlapping weekday shifts at Elmhurst. Three people worked 6:00 a.m. to 4:00 p.m., one person working 10:00 a.m. to 7:00 p.m., and one person working 3:00 p.m. to 12:00 a.m. Crothall managers were not present for the overnight housekeeping shifts (12:00 a.m. to 6:00 a.m.) nor weekend shifts, although housekeeping work continued during those times and was overseen by separate HHC housekeeping supervisors. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **26:20-28:16; Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶ **1; Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **24:10-25:5; 105:8-12; Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) TT **1-2.**

**RESPONSE:** Disputed.

Exhibit G to the Contract requires that Crothall assign seven (7) full time managers to Elmhurst. Exhibit G also does not delineate the hours considered day or evening time. In addition, neither Rossi nor Fonseca testified that they were at Elmhurst Hospital overnight or weekends. Neither Rossi nor Fonseca can have personal knowledge concerning the presence of HHC personnel acting as supervisors. Therefore, the statements are not admissible to prove the facts claimed.

**REPLY:** Plaintiff provides no citations to dispute the statements, and Plaintiff's response does not dispute the witnesses' testimony. While the Contract did initially state that Crothall would have 7 managers assigned to Elmhurst, the Contract also states that Crothall may provide fewer managers with the prior approval of HHC. **Exhibit 5** HHC Contract, § **3.1(a)(i).** The fact that Crothall managers did not work the overnight and weekend shifts at Elmhurst does not mean they were not aware of whom did work those shifts from their work experience (such as arriving in the morning at the time overnight and weekend shift were ending).

24.     At Elmhurst, HHC employed eight or nine additional housekeeping supervisors that also oversaw and directed the work HHC's housekeeping personnel, sometimes in conjunction with Crothall, sometimes independently. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **24:10-25:5, 35:25-36:20, 43:4-12, 66:14-19, 70:8-71:8; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **99:4-12.** HHC housekeeping supervisors were present for all shifts. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶¶ **1-2.**

**RESPONSE:** Disputed.

Crothall's manager Fonseca worked without supervision by any HHC supervisor. CSOF # 135. Fonseca even was the "boss" of Sonya, an HHC supervisor and directed the HHC supervisor at Elmhurst hospital. CSOF # 136. If there were problems, Sonya, the HHC supervisor, reported them to Fonseca. CSOF #137. There was a hierarchy at Elmhurst: Jose Chevalier from Crothall was in charge; Guy Petriello from Crothall reported to Chevalier; Fonseca reported to Petriello and Chevalier; HHC supervisors reported to Crothall. Reyes Counter-statement of Undisputed Facts # 139 ("CSOF #"). Fonseca's affidavit is inconsistent with her deposition testimony.

**REPLY:** Plaintiff's response does dispute the statements of fact.   Plaintiff responds that there was a hierarchy for housekeeping oversight (which Crothall does not dispute) and that HHC's housekeeping supervisors would report to Crothall managers (which Crothall does not dispute, but adds Crothall also had to report to HHC), but the evidence is undisputed that HHC's housekeeping supervisors could also act independent from Crothall, during both daytime shifts and during overnight and weekend shifts where Crothall managers were not onsite.   Plaintiff provides not citation to evidence stating HHC housekeeping supervisors did not also oversee HHC's housekeepers.

25.     At Elmhurst, Crothall managers and HHC housekeeping supervisors would split up the work of overseeing the HHC housekeepers when Crothall managers and HHC supervisors were both on duty. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **86:12-14.** HHC housekeeping supervisors spent more time interacting directly with housekeepers and hospital staff than Crothall managers throughout the day. HHC housekeeping supervisors provided more direct instruction and review of housekeeping worker's work than Crothall managers and would do so independently, without consulting with Crothall managers. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) 112.

**RESPONSE:** Disputed.

See response to Crothall SOF #24 and Reyes CSOF #139. In addition, Fonseca's affidavit is in complete conflict with her deposition testimony.

**REPLY:** The citations from Plaintiff do not dispute the evidence cited by Defendant. Plaintiff cites to testimony stating that HHC housekeeping supervisors would report to Crothall managers, but such does not dispute the above statements.

26.     At Elmhurst, HHC had approximately 153 housekeeping staff to perform housekeeping work, approximately 65 per day shift. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **118:6-9; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **43:20-24.**

**RESPONSE:** Undisputed.

27.     Crothall and HHC personnel both trained the housekeepers to place wet floor signs on the floor when the floor was wet. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **77:18-22; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **37:17-1**

**RESPONSE:** Disputed.

Fonseca testified that Crothall trained the housekeepers. In fact, Crothall was required by the Contract to prepare training materials and to conduct training which it did daily, weekly, monthly semi-annually and annually. The purpose of training was to teach housekeepers to clean the Crothall way. Except for attending training, HHC supervisors did not conduct training. CSOF #63, 81, 82, 83, 84, 98, 99, 100, 108, 116, 120, 121, 123, 124. Fonseca's affidavit is inconsistent with her deposition testimony.

**REPLY:** Plaintiff does not provide citations that dispute the statements of fact.  Both Mr. Rossi and Ms. Fonseca testified that Crothall provide training to housekeepers at Elmhurst and that HHC/the hospital also provided training.  **SOF 29.**  Both entities trained housekeepers to use wet floor signs when mopping.  There is no citation to evidence stating they did not both do so.

28.     Crothall and HHC personnel both monitored housekeepers and correct them if wet floor signs were not placed on wet floors. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **79:5-8, 102:6-14**

**RESPONSE:** Disputed in part.

HHC housekeepers, including the housekeeping supervisors, all reported to Crothall. CSOF # 135, 136, 139

**REPLY:** Plaintiff's response does dispute the statement of fact.   The facts that HHC supervisors and housekeepers would "report" to Crothall managers does not dispute the witness testimony that both Crothall and HHC personnel would monitor the housekeepers and correct them.

29.     At Elmhurst, HHC's housekeeping supervisors would receive training from both Crothall and HHC. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **87:3-4.**

**RESPONSE:** Undisputed.

16

30.     At Elmhurst, Crothall managers would create work schedules based on the Housekeeping Service Specifications provided by HHC, the number of HHC housekeepers provided by HHC, and in accordance with the policies and procedures of HHC. **Exhibit 5 HHC Contract, Ex. A — Scope of Services, Ex. A-1 — Housekeeping Service Specifications; Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **99:13-100:18.**

**RESPONSE:** Disputed.

Crothall has not produced during discovery or on its motion any HHC policies and procedures. Crothall's witnesses testified at length during depositions about Crothall's sole responsibility to prepare schedules. This is consistent with Crothall's Contract. There was a requirement for Crothall to develop a staffing plan and for HHC to approve the plan. This is distinct from Crothall's sole responsibility to prepare work schedules. CSOF #56, 62, 97, 116, 119.

**REPLY:** Plaintiff's response does not dispute the statements of fact.  Crothall would create housekeeping schedules, but the work to be performed, the labor to perform the work, and policies and procedures that governed the work were determined by HHC.  The witness testimony is uncontroverted that Crothall could not just create whatever schedule it desired, free from HHC's direction and involvement.

31.     At Elmhurst, the housekeeping department personnel, including Crothall managers and HHC housekeeping supervisors and workers, met in each morning in a "huddle" to discuss any specific housekeeping needs for that day at that facility. Crothall managers primarily organized and spoke at the huddle, but HHC supervisors and personnel could also contribute. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **107:17-21.**

**RESPONSE:** Disputed in part.

The deposition excerpt does not support the statements except that an HHC supervisor could speak during the "huddles."

**REPLY:** Crothall acknowledges its citation was incomplete but for the section agreed to by Plaintiff.  However, Plaintiff set out in the Counterstatement of Facts the remaining information and citations to show the above statement are not disputed.

32.     Routine cleaning of the floors was typically scheduled to be performed during overnight hours, and localized "spot" cleaning was performed as needed or requested during the daytime shifts. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **52:5-13.**

**RESPONSE:**  Undisputed.

33.     In addition to regularly scheduled housekeeping work, either Crothall or HHC personnel could direct housekeepers to perform work in additional areas as the need arose (such as when spills occurred). **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **98:20-24. Exhibit 5** HHC Contract, **Ex. A-1 — Cleaning Specifications A and D.**

**RESPONSE:**  Disputed.

The deposition excerpt does not specify any task that a housekeeper could be instructed to perform by an HHC supervisor.

**REPLY:** The cited testimony states that during the course of the day at Elmhurst, HHC personnel could engage housekeepers directly to ask them to do something or perform a task.  The cited Contract sections state that housekeepers will mop up major spills on request 24-hours a day and that EVS associates will check with Operating Room Supervisor to confirm if additional work is needed at the beginning of each shift, prior to starting the daily routine.  Respectfully, the citations support the statements of fact, and Plaintiff does not provide any evidence that disputes them.

34.     HHC personnel or other hospital personnel (such as maintenance workers, security personnel, or doctors and nurses) could direct housekeepers to perform work in a specific area or attend to a particular housekeeping need (such as a spill) without consulting with Crothall managers. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **98:20-24; 102:19-103:2; Exhibit 5** HHC Contract, **Ex. A-1 — Cleaning Specifications A and D.; Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶ **3-4.**

**RESPONSE:** Disputed.

The deposition excerpt and the affidavit do not support the statements. Crothall is adding facts that are missing from the evidence to support conclusions.

**REPLY:** The cited testimony states that HHC personnel could direct HHC's housekeepers to attend to housekeeping needs without consulting with Crothall.  Plaintiff cites to know evidence to dispute these statements.

35.     At Elmhurst, HHC maintained separate Maintenance (also referred to as Facilities), Security, and Safety departments, with which Crothall had no role or oversight, and HHC controlled the access of different personnel to different parts of the facility through credentials and security clearance. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) 11 **3-4.**

**RESPONSE:** The statement even if true is not relevant. Crothall's Contract concerned housekeeping and has nothing to do with HHC's maintenance, security and safety departments.

**REPLY:** Plaintiff does not provide a citation to any evidence disputing that HHC maintained these separate departments at Elmhurst over which Crothall had no role or oversight or that HHC controlled access to different parts of the facility.  Crothall disputes that Maintenance, Security, and Safety departments have "nothing" to do with housekeeping or the underlying safety of the premise.

36.    At Elmhurst, wet floors could be reported through a call center operated by NYCHHC personnel. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **106:16107:3.**

**RESPONSE:** Undisputed except as noted below.

The statement of fact is incomplete because if the call is related to housekeeping, Crothall is notified and will instruct the housekeeper to handle the problem. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 106:11-107:17.**

**REPLY:** Plaintiff does not dispute the statement but instead cites to additional testimony in support of an additional fact.  Crothall does not dispute that calls into HHC's call center dealing with housekeeping needs should be directed to Crothall by HHC personnel, at least during shifts where Crothall is present, but in the first instance, it is HHC personnel identifying a concern calling in information to other HHC personnel, who then decide who will be contacted next.

37.    At Elmhurst, HHC maintained its own accident reporting system and records. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **50:5-51:6.**

**RESPONSE:** Undisputed except as noted below. The statement of fact is incomplete because the report is provided to Crothall so that Crothall can follow up. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 50:5-17.**

**REPLY:** Plaintiff does not dispute the above statement.  Plaintiff provides an additional statement that is not supported by the citation provided by Plaintiff.  In the testimony cited by Plaintiff, Ms. Fonseca does not testify that all reports are provided by HHC to Crothall, and it is undisputed that the underlying accident in this case was not reported to Crothall by HHC. **SOF 43.**

38.    Reports of a wet floor may be directed to Crothall managers or could be directed to other HHC or hospital personnel without notice to Crothall. Crothall managers were not notified

of every spill or wet floor nor the direction of housekeepers to address them. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶ **4.**

**RESPONSE:** Undisputed.

39.    At Elmhurst, wet floor signs were accessible to and could be placed by HHC or hospital personnel in addition to housekeepers. **Exhibit 6** Affidavit of Yulieth Fonseca (Dated: May 11, 2018) ¶ **5.**

**RESPONSE:** Disputed.

There is no statement that HHC supervisors placed wet floor signs on their own.

**REPLY:** The cited testimony states, "wet floor signs were accessible to and could be placed by NYCHHC or hospital personnel in addition to EVS workers and managers." Respectfully, the citations supports the statement, and Plaintiff has provided no citation to dispute it.

40.    At Elmhurst, Crothall managers received input from non-housekeeping HHC personnel on a daily basis as to additional housekeeping work to be performed. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **33:6-16. Exhibit 5** HHC Contract, **Ex. A-1 Specifications E and F.**

**RESPONSE:** Undisputed.

41.    At Elmhurst, areas of the facility are policed by an HHC housekeeper who monitor for housekeeping needs (such as spills or rubbish), and the HHC housekeeper may address those housekeeping needs as they are discovered without communication with Crothall personnel. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **53:14-54:19; Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **97:18-98:18.**

**RESPONSE:** Undisputed.

21

42.     At Elmhurst, the first floor where Plaintiff fell was policed at the time by an HHC housekeeper, who could perform housekeeping work as needed without communication with Crothall. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **62:17-63:4; 67:10-13.**

**RESPONSE:** Undisputed.

43.     Crothall did not receive a report of Plaintiffs fall or of the floor being wet. **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **114:12-16.**

**RESPONSE:** Undisputed.

44.     Plaintiff testified she knew Crothall was a housekeeping company but did not know what they did at Elmhurst, did not work with them, and did not know what the HHC Contract with Crothall entailed. **Exhibit 2** Depo of Daisy Reyes (Dated: September 14, 2017) at **39:25-41:7.**

**RESPONSE:** Undisputed.

## PLAINTIFF'S COUNTER STATEMENT OF UNDISPUTED MATERIAL FACTS

45.     On August 31, 2015, Plaintiff, Daisy Reyes, suffered severe personal injuries as a result of a slip and fall, on water located in the hallway, that occurred while she was working for HHC (at Elmhurst Hospital), in the Nursing Administration Department. **Complaint at ¶¶6, 12, Exhibit 1 to Crothall's motion papers.**

**RESPONSE:** Not disputed for the purposes of Crothall's summary judgment motion.

46.     Reyes's slip and fall was caused when a housekeeping employee (under the direct control of Crothall) who had mopped the floor, neglected to place a cautionary wet floor sign in the area he was mopping. **Complaint at ¶7, Exhibit 1 to Crothall's motion papers.**

**RESPONSE:** Disputed in part.  Crothall disputes that the housekeeper was under the direct control of Crothall.  Plaintiff does not report seeing any Crothall personnel at the location, HHC personnel may also direct housekeepers to mop up spills (and do so without contacting

22

Crothall), and the same location/floor was overseen by an HHC supervisor at the time. **SOF 38, 41, and 42.**

47.     Reyes observed this housekeeper approximately 15 minutes prior to her fall when she was using the bathroom adjacent to the area where she later fell. The housekeeper appeared to be preparing to mop the hallway. Reyes then returned to her office. She left her office to go to lunch. On her way to lunch, Reyes slipped on the wet floor and fell. There were no wet floor warning signs placed in the hallway. Reyes clothing was covered with cleaning fluid which she smelled on her clothing. **Reyes Deposition Excerpts Joint Appendix- Exhibit 2 at 19:2120:17, 25:2-24, 27:9-21, 29:22-31:17.**

**RESPONSE:** Not disputed for the purposes of Crothall's summary judgment motion.

### The Contract

48.     On or about November 11, 2001, Crothall entered into a written Contract with HHC that outsourced to Crothall all of HHC's housekeeping services. **Exhibit 5 to Crothall's motion papers at pg. 2.**

**RESPONSE:** Disputed. The Contract did not outsource to Crothall all of HHC's housekeeping services.  Crothall entered a Contract with HHC to provide certain management services for HHC's Environmental Services Program.  **SOF 8.**  The Contract clearly states that HHC's union personnel will continue to perform the housekeeping work at HHC's facilities; that HHC's policies and procedures will govern the housekeeping work under the Contract; that HHC will control the selection and number of Crothall managers; that the specific housekeeping tasks and frequency of tasks is set out by HHC in the Contract; that HHC reserves the right to decide changes to staffing or housekeeping services under the Contract; and that all services under the Contract shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§§ 2.3,**

**2.4, 2.5, 3.1, Exhibit A – Scope of Services, par. 1(c); and Exhibit A-1 – Cleaning Specifications.**

49.     The Contract was in effect at the time of Reyes's accident at Elmhurst Hospital. **Exhibit 5 to Crothall motion papers, Contract at pg. 3 (art. 1); Exhibit B.**

**RESPONSE:** Not disputed.

50.     The Contract states that Crothall will "... assume responsibility for managing [HHC's] Unionized Employees" in the delivery of all housekeeping services for HHC. **Exhibit 5 to Crothall's motion papers, Contract at pg. 2.**

**RESPONSE:** Disputed in part.  Plaintiff cites one portion of a prefatory clause of the Contract, and adds language, while ignoring the more detailed contractual provisions that follow, which detail responsibilities, authority, and control retained by HHC under the Contract. **Exhibit 5** HHC Contract **§§ 2.3, 2.4, 2.5, 3.1, Exhibit A – Scope of Services, par. 1(c); and Exhibit A-1 – Cleaning Specifications.**

51.     The Contract further obligates Crothall to purchase at its expense all supplies and equipment for the performance of housekeeping services. **Exhibit 5 to Crothall's motion papers, Contract at pg. 2.**

**RESPONSE:** Disputed in part.  Plaintiff cites one portion of a prefatory clause of the Contract while ignoring the more detailed contractual provisions that follow, which detail how HHC and Crothall divide responsibilities for purchasing equipment and supplies (including HHC paying for some equipment and supplies and reimbursing Crothall for some equipment and supplies).  **Exhibit 5** HHC Contract **§§ 3.1 e and k.**

52.     Crothall agreed to guarantee the maximum cost HHC will pay for housekeeping services including, the costs (i) for housekeepers, (ii) overtime paid to housekeepers, (iii) supplies

and equipment and (iv) Crothall's staff, so that HHC would not pay more than the limits set forth in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pgs. 2, 5-13 (art. 3.1).**

**RESPONSE:** Disputed in part.  Crothall provided guarantees to HHC for various projected expenses paid by HHC, but HHC also retained the ability to change the amount or quality of housekeeping services covered under the Contract and/or the amount of Crothall staff, which would change the guarantee amounts under the Contract.  **Exhibit 5** HHC Contract **§§ 2.4, 2.5, 2.6, 3.1(b)(i) and Exhibit A (Scope of Services), par. 1(a).**

53.     Crothall agreed to reimburse HHC the amount of overtime costs for housekeepers exceeding the guaranteed cost in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pgs. 8-9 (art.3.1 (d)).**

**RESPONSE:** Disputed in part.  Crothall provided guarantees to HHC for various projected expenses paid by HHC, but HHC also retained the ability to change the amount or quality of housekeeping services covered under the Contract and/or the amount of Crothall staff, which would change the guarantee amounts under the Contract.  **Exhibit 5** HHC Contract **§§ 2.4, 2.5, 2.6, 3.1(b)(i), 3.1(d), and Exhibit A (Scope of Services), par. 1(a).**

54.     Crothall agreed that it would assume existing contracts with third-parties and directly procure all products and services with third-parties to perform the Contract and that the cost of these products and services would not exceed the amount set forth in the Contract. **Exhibit 5 to Crothall's motion papers Contract at pgs. 10-11 (art. 3.1 (e); Exhibit "A" (2); Exhibit "A-4."**

**RESPONSE:** Disputed in part.  The Contract does not state Crothall will assume existing contracts of HHC; it states Crothall will procure services/contracts within 120 days, after which HHC will reimburse Crothall for all products and services under a set limit.   Assumption was one

25

way to accomplish this, if possible. Crothall provided guarantees to HHC for various projected expenses paid by HHC, but HHC also retained the ability to change the amount or quality of housekeeping services covered under the Contract and/or the amount of Crothall staff, which would change the guarantee amounts under the Contract. **Exhibit 5** HHC Contract **§§ 2.4, 2.5, 2.6, 3.1(b)(i), 3.1(d), 3.1(e) and Exhibit A (Scope of Services), par. 1(a).**

55.    Crothall further agreed that its management fees will not exceed the amounts set forth in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pg. 2.**

**RESPONSE:** No disputed.

56.    HHC provided the unionized housekeeping employees to work under Crothall's direction, supervision and control. **Exhibit 5 to Crothall's motion papers, Contract at pg. 3 (art. 4).**

**RESPONSE:** Disputed in part. Defendant dos not find comparable language on page 3 or article 4 of the Contract. Regardless, Defendant does not dispute that under the Contract, HHC provides its pre-existing union EVS workers, and that Crothall provides the EVS management and training set out in the Contract. However, Crothall does dispute that Crothall had sole direction, supervision, or control over HHC's unionized employees, as the Contract sets out responsibilities, authority, and control retained by HHC under the Contract. **Exhibit 5** HHC Contract **§§ 2.3, 2.4, 2.5, 3.1, Exhibit A – Scope of Services, par. 1(c); and Exhibit A-1 – Cleaning Specifications.**

57.    Crothall agreed to develop and implement, subject to agreement between HHC and Crothall, a staffing plan to perform the housekeeping services the goal of which was to lower HHC's costs for unionized housekeepers and equipment all subject to the guaranteed prices in the Contract. **Exhibit 5 to Crothall's motion papers, Contract at pg. 4 (art. 2.5).**

26

**RESPONSE:** Disputed in part. Under the section cited, Crothall agreed to follow HHC's staffing plan and within 9-12 months propose to HHC a revised staffing plan. Plaintiff neglects to include that Crothall could not implement any change without HHC's involvement (including any reduction in HHC staff or Crothall staff) or that it was HHC's stated goal to reduce its own staffing (not Crothall's goal).

58.     Exhibit A to the Contract details the "Scope of Services" Crothall agreed to perform. **Exhibit 5 to Crothall's motion papers.**

**RESPONSE:** Disputed in part. Exhibit A to the Contract sets out services and contractual obligations of Crothall and others, not just Crothall. For example, it specifically states HHC's unionized employees will perform the housekeeping services, the work will be done in accordance with the policies and procedures of HHC, and that HHC's Materials Department will collaborate with Crothall in negotiating with providers of services for the housekeeping department.

59.     Crothall was obligated to meet the housekeeping services listed in Exhibit "A-1" at areas listed in Exhibit "A-2." The frequency of housekeeping services to be performed were also listed in Exhibit "A-1." **Exhibit 5 to Crothall's motion papers, Contract.**

**RESPONSE:** Denied in part. Exhibit A specifically states the housekeeping tasks set in HHC's specifications (A-1) will be performed by HHC's unionized employees. Defendant does not dispute that Exhibit A-1 sets out the housekeeping tasks HHC wanted performed at its facilities and the frequency of those tasks.

60.     The Contract includes nineteen (19) Cleaning Specifications totaling approximately twenty-eight (28) pages of described duties for identified locations of HHC's facilities. **Exhibit 5 to Crothall's motion papers, Contract, Exhibit A-1.**

27

**RESPONSE:** Not disputed in part. HHC's specifications are divided into 19 parts, covering different areas of the hospitals. Each part sets out multiple, specific cleaning tasks HHC wanted performed in the different areas.

61. The Cleaning Specifications do not describe the means and methods for performing housekeeping services. While damp mopping is listed in multiple portions of the Cleaning Specifications, the Contract is silent on how damp mopping is to be performed. **Exhibit 5 to Crothall's motion papers, Contract, Exhibit A-1.**

**RESPONSE:** Disputed. The Cleaning Specifications do describe the means and methods for performing housekeeping services in varying detail. Moreover, Exhibit A states that all work shall be performed in accordance with HHC's policies and procedures as such shall be made known to Crothall by HHC.

62. To perform the required housekeeping services, Crothall agreed to "[t]rain, manage and direct [HHC's] Unionized Employees in the performance of the Services, in accordance with [HHC's] policies and procedures as such shall be made known to Contractor by [HHC]." **Exhibit 5 to Crothall's motion papers, Contract, Exhibit 'A" (1) (c).**

**RESPONSE:** Disputed in part. Defendant does not dispute the quoted language. Defendant does dispute the prefatory language, which does not differentiate between the management services provided by Crothall and the housekeeping tasks performed by HHC's housekeepers.

63. Crothall has not included with its motion for summary judgment any HHC policies or procedures documenting that HHC maintained control in how its housekeepers performed services under the control, management and direction of Crothall. **See Crothall motion papers.**

**RESPONSE:** Disputed in part.  Defendant has provided HHC's Contract and witness testimony which describe some policies and procedures of HHC with regard to its housekeeping staff and services.  Defendant has not provided a "policies and procedures" document from HHC.

64.     Crothall obligated itself to "[p]rovide and maintain training materials to be used in training ... [HHC's] Unionized Employees." **Exhibit 5 to Crothall's motion papers, Contract, Exhibit "A" (1) (e).**

**RESPONSE:** Not disputed, to the extent Crothall owed that contractual obligation to HHC.

65.     Crothall was also responsible to "... maintain... time records and furnish... to [HHC] data from which [HHC] can formulate its regular payroll, maintain department budgets." **Exhibit 5 to Crothall's motion papers, Contract, Exhibit "A" (1) (d).**

**RESPONSE:** Not disputed, to the extent Crothall owed that contractual obligation to HHC.

66.     Crothall agreed to "[f]urnish appropriate modules of [its] proprietary software, TeamCoach© ... for housekeeping services..." **Exhibit 5 to Crothall's motion papers, Contract, Exhibit "A" (1) (g).**

**RESPONSE: Response -** Not disputed, to the extent Crothall owed that contractual obligation to HHC.

67.     According to Crothall's web site, "TeamCoach is [its] technology platform for maximum productivity. The detailed analytics produced by TeamCoach provide meaningful use data to correct, teach and train for each frontline associate. [Crothall] can pinpoint down to the employee/supervisor/area and task performed to focus [its] coaching." **Exhibit A to Reyes's opposition papers.**

**RESPONSE:** Crothall does not dispute the quoted language appears on its website.

68.     The Contract also included Crothall's guarantee to improve patient satisfaction with the delivery of housekeeping services. If patient satisfaction failed to improve by certain agreed to percentages, Crothall agreed to pay a financial penalty to HHC. **Exhibit 5 to Crothall's motion papers, Contract, Exhibit E.**

**RESPONSE:  Response –** Not disputed.

### Crothall's Standard Operating Process Manual ("SOP")

69.     Crothall's SOP is annexed as Exhibit B to Reyes's opposition papers.

**RESPONSE:** Not disputed, to the extent Plaintiff is referencing the version of the SOP that was attached.

70.     Crothall's "SOP" was not produced prior to the depositions of Crothall's witnesses. Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 15:3-8.

**RESPONSE:** Not disputed.

71.     Subsequent to depositions, Crothall produced a copy of its "SOP" which is titled "Environmental Services Standard Operating Process." **Wigler Declaration, _; exhibit B to Reyes opposition papers.**

**RESPONSE:** Not disputed.

72.     The purpose of the SOP is "[t]o provide a blueprint for hourly associates to perform their daily cleaning requirements and to ensure that the cleaning specifications identified in the agreement are delegated through written cleaning assignments." **Exhibit B to Reyes opposition papers at 150.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the quoted language,

but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

73. Examples of duty lists with detailed assignments including mopping floors used by Crothall are included in the SOP. **Exhibit B to Reyes opposition papers at 151-155.**

**RESPONSE:** Disputed in part. It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains examples of duty lists, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

74. Each housekeeper is required by Crothall's SOP to sign his/her duty list and a copy is inserted into each housekeeper's file. **Exhibit B to Reyes opposition papers at 150.**

**RESPONSE:** Disputed in part. It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

31

75.     The SOP requires Crothall to prepare schedules on a two-week basis with days/on and days/off for each housekeeper. **Exhibit B to Reyes opposition papers at 159-161.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

76.     The SOP requires Crothall to prepare sign in/sign out sheets on a daily basis that housekeepers must sign. **Exhibit B to Reyes opposition papers at 162-165.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed at HHC's facilities or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

77.     Crothall's SOP requires housekeepers to sign out keys and pagers at the start of each shift and to sign in keys and pagers at the end of each shift. **Exhibit B to Reyes opposition papers at 166-167.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited

application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

78.    Crothall's SOP requires housekeepers to sign for the receipt of paychecks. **Exhibit B to Reyes opposition papers at 168-169.**

**RESPONSE:** Disputed in part. It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

79.    Crothall's SOP requires housekeepers to maintain restroom logs documenting services performed. **Exhibit B to Reyes opposition papers, at 170-171.**

**RESPONSE:** Disputed in part. It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

33

80.     The SOP requires Crothall to follow a written procedure titled "Procedure 3.01: Quality Inspections & High Touch Surface Focus" at least two times each month with each housekeeper. **Exhibit B to Reyes opposition papers at 195-197.**

**<u>RESPONSE:</u>** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

81.     The SOP requires Crothall to conduct customer surveys and asks its customers to "[r]ate the responsiveness of our staff to your requests." **Exhibit B to Reyes opposition papers at 198-200.**

**<u>RESPONSE:</u>** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

82.     The SOP requires Crothall to conduct monthly "Communications, help and Training" ("CHAT") meetings that all housekeepers are required to attend. **Exhibit B to Reyes opposition papers at 202-204.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

83.    The SOP requires Crothall to conduct mandatory annual training, including mopping, for housekeepers and maintains individual housekeeper training records. **Exhibit B to Reyes opposition papers at 205-207.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

84.    For new housekeepers, Crothall's SOP also mandates three (3) days of training. **Exhibit B to Reyes opposition papers at 208-210.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated

35

into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

85.     On a weekly basis, Crothall's SOP mandates training, including mopping, for housekeepers. **Exhibit B to Reyes opposition papers at 211-213.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

86.     Crothall financially rewards housekeepers who meet or exceed "key performance and specific performance measurements." **Exhibit B to Reyes opposition papers at 215-216.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

87.     One of Crothall's values is "... to consistent team work in order to achieve collective goals." **Exhibit B to Reyes opposition papers at 224.**

**RESPONSE:** Not disputed, though a word may be missing.

88.     Crothall is committed to quality improvement and requires that its "... 'reports are posted and shared with our EVS [housekeepers] staff' so that they can see the results and the progress they are making." **Exhibit B to Reyes opposition papers at 229.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies  and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC.  **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

89.     Crothall requires its managers to be committed to and to acknowledge and consider them as long term and dedicated individuals responsible for Crothall's success. **Exhibit B to Reyes opposition papers at 230.**

**RESPONSE:** Not disputed**.**

90.     Crothall requires housekeepers without exception to conform to (i) detailed physical appearance standards that include clothing, proper footwear, nail length and hair style, (ii) how to greet patients and other etiquette with patients, (iii) not eat or drink except in cafeterias and break rooms, (iv) be pleasant with other hospital employees but not engage in excessive socializing. **Exhibit B to Reyes opposition papers at 249.**

**RESPONSE:** Disputed in part.  It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced

37

guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

91.    SOP requires Crothall to purchase all supplies and equipment it approves and provides for the performance of the Contract solely through Crothall's Compass Group system. The supplies and equipment include mops, buckets, wet floor signs. **Exhibit B to Reyes opposition papers at 284-292, 289-291.**

**RESPONSE:** Disputed in part. It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

92.    The SOP includes "Policy 10.11:  General Liability Reporting Process." The following is included in this policy: "When a non-employee (i.e. visitor, patient, customer, etc.) is injured at one of our facilities we must report it immediately to our insurance carrier. There are a variety of reasons this could occur: employee failed to follow procedures; faulty equipment; employee negligence, etc..." **Exhibit B to Reyes opposition papers at 305.**

**RESPONSE:** Disputed in part. It is undisputed that Crothall's SOP, an internal Crothall document providing general guidelines to Crothall employees that on its face has limited application regarding differing contracts, facilities, or client needs, contains the referenced

guideline, but Defendant disputes any extent to which Plaintiff is inferring the SOP is incorporated into or supersedes the actual HHC Contract terms, including that HHC's policies and procedures govern the work to be performed under that contract or that all work shall be subject to the direction and control of HHC. **Exhibit 5** HHC Contract **§ 2.3 and Exhibit A.**

<u>**Crothall's Control of Housekeeping Employees and Services At Elmhurst**</u>

93.     On October 27, 2017, Richard Rossi ("Rossi") testified in this action as a witness on behalf of Crothall. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 1.**

**RESPONSE:** Disputed in part. Plaintiff did not serve a deposition notice seeking testimony on behalf of the corporation under Rule 30(b)(6). Mr. Rossi was produced as a fact witness with some knowledge of Crothall's work at Elmhurst due to his work as Regional Director.

94.     Rossi at the time of the deposition and the Reyes accident was employed by Crothall as the Regional Director of Operations with an office at 61 Broadway, New York, New York. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 5:11-6:24.**

**RESPONSE:** Not disputed.

95.     Rossi is "responsible for overseeing the financial and operational performance of all of the facilities within [his] region" *i.e., "...* manage the managers who manage the particular management operations at each of the facilities." **Rossi Deposition Excerpts Joint Appendix-Exhibit 3 at 8:13-22.**

**RESPONSE:** Not disputed, to the extent Mr. Rossi is addressing the financial and operational performance for Crothall.

96.     One of the facilities Rossi visited for his work is Elmhurst Hospital. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 10:24-11:2.**

**RESPONSE:** Not disputed.

97.     In August 2015, Crothall assigned five (5) individuals to work at Elmhurst including a supervisor, and assistant supervisor, director, assistant director and/or operations managers. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 23:17-24:16.**

**RESPONSE:** Not disputed.

98.     Crothall (i) managed the cleaning operation at Elmhurst, (ii) supervised and directed the cleaners, (iii) had sole responsibility to schedule when cleaners worked and (iv) prepared duty lists that directed and assigned work on a daily basis to the cleaners. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 27:20-28:24, 39:2-41:20.**

**RESPONSE:** Disputed in part.  Not disputed to the extent Mr. Rossi was discussing Crothall's activities and not discussing the role of HHC.  Mr. Rossi's undisputed testimony was HHC also serviced and directed the work of HHC' housekeepers.  **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **35:25-36:20.**  And Crothall's creation of schedules and duty lists was subject the conditions, direction, policies and procedures of HHC.  **SOF 9, 10, 12; Exhibit** 5 HHC Contract, § **2.5; § 3.1; Ex. A — Scope of Services; Ex. A-1 — Housekeeping Service Specifications.**

99.     Pursuant to its Contract with HHC, Crothall trained, managed and directed HHC's unionized employees who worked as housekeepers at Elmhurst. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 32:18-23.**

**RESPONSE:** Disputed in part.  Not disputed to the extent Mr. Rossi was discussing Crothall's activities and not discussing the role of HHC.  Mr. Rossi's undisputed testimony was HHC also serviced and directed the work of HHC' housekeepers.  **Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **35:25-36:20.**  And Crothall's creation of schedules and duty lists was subject the conditions, direction, policies and procedures of HHC.  **SOF 9, 10, 12, and**

**29; Exhibit** 5 HHC Contract, § **2.5; § 3.1; Ex. A — Scope of Services; Ex. A-1 — Housekeeping Service Specifications.**

100.    In training HHC's employees, Crothall taught them how to clean Crothall's way. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 43:10-44:11.**

**RESPONSE:** Not disputed to the extent that Mr. Rossi specifically stated was referring to increasing efficiency and specifically stated that Crothall's method of mopping was not notably different than HHC's. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 43:4-45:3.**

101.    Training of housekeepers was performed weekly, monthly, semi-annually and annually. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 47:7-23.**

**RESPONSE:** Not disputed.

102.    Crothall can recommend that housekeepers be disciplined and terminated if a housekeeper is not performing as required by Crothall. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 55:11-21, 65:17-66:13.**

**RESPONSE:** Disputed in part.  Defendant does not deny Crothall could recommend discipline or termination to HHC, which had the authority to make employment any decisions regarding HHC's housekeepers.  The testimony cited does not state recommendations were based on "performing as required *by Crothall*." **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 55:3-19.**

103.    Crothall provides all the chemicals for mopping, the mops and buckets and the caution signs for wet floors to the housekeepers. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 63:7-65:22.**

**RESPONSE:** Disputed in part.  Crothall does not dispute that under the HHC Contract, Crothall arranged for housekeeping supplies and equipment to be supplied at HHC's facilities.

Crothall disputes that "all" supplies and equipment came from Crothall, as HHC's facilities had supplies and equipment prior to the HHC Contract that continued to be used.  In addition, supplies and equipment were approved by HHC, HHC reimbursed Crothall for most anticipated purchases (up to a set amount), and ownership of supplies and equipment transfer to HHC after a set period of time.  **Exhibit 5** HHC Contract **§§ 3.1(e), 3.1(k)(i) and 3.1(k)(ii); Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **81:25-82:13.**

104.     Prior to mopping, housekeepers are supposed to put up caution signs when they wet mop a floor using chemicals. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 77:13-78:9.**

**RESPONSE:** Not disputed.

105.     The caution signs can be removed when the floor dries after mopping. **Rossi Deposition Excerpts Joint Appendix- Exhibit 3 at 78:10-79:3.**

**RESPONSE:** Not disputed.

106.     On January 9, 2018, Yulieth Fonseca ("Fonseca") testified at a deposition in this action as a witness on behalf of Crothall. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at** 1.

**RESPONSE:** Disputed in part.  Plaintiff did not serve a deposition notice seeking testimony on behalf of the corporation under Rule 30(b)(6).  Ms. Fonseca was produced as a fact witness with knowledge of Crothall's work at Elmhurst due to her work as an Assistant Director at the time.

107.     Fonseca has been employed by Crothall since approximately 2014. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 12:8-10.**

**RESPONSE:** Not disputed.

108.   Initially Fonseca was hired as an Assistant Director for Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 12:11-15.**

**RESPONSE:**  Not disputed.

109.   As an Assistant Director for Crothall, Fonseca is responsible for how facilities are cleaned including the training of housekeepers and making sure that they follow procedures. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 12:16-13:6.**

**RESPONSE:**  Not disputed.

110.   Fonseca stated that Crothall is responsible for managing all HHC's housekeepers performing housekeeping services. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 13:13-14:2.**

**RESPONSE:**  Not disputed to extent the witness discussed Crothall's activities and did not discuss those of HHC.

111.   When Crothall hired her, Fonseca underwent "foundations" training by Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 14:3-6.**

**RESPONSE:**  Not disputed.

112.   "Foundations" training is based on a document titled "SOP" which sets forth Crothall's policies about what was expected of Fonseca in performing her duties on behalf of Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 14:7-15:4.**

**RESPONSE:** Not disputed to the extent that Crothall's SOP is an internal Crothall document that sets out general guidelines that may or may not apply in regard to differing contracts, facilities, and/or client needs.

113.   Crothall's "SOP" was not produced prior to the depositions of Crothall's witnesses. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 15:5-8.**

**RESPONSE:** Not disputed.

114. Subsequent to depositions, Crothall produced a copy of its "SOP" which is titled "Environmental Services Standard Operating Process." **Wigler Declaration, exhibit "B" to Reyes opposition papers.**

**RESPONSE:** Not disputed.

115. The "SOP" according to Fonseca also details written policies governing the management of HHC housekeepers by Crothall. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 15:9-19.**

**RESPONSE:** Disputed. The cited testimony does not include Ms. Fonseca stating that the SOP "governed" management of HHC personnel. Ms. Fonseca testified that Crothall's SOP was used in conjunction wither her earlier training by Crothall and contained examples of duty lists, procedures, schedules, training and policies "with respect to" managing employees of HHC. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 14:3-15:25.** When specifically asked if Crothall could alter the policies and procedures or overall scheduling for housekeeping without consulting with HHC, Ms. Fonseca answer that HHC would make those decisions and that HHC must be consulted for changes to the housekeeping program. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 99:13-100:18.**

116. After completion of training, Fonseca was assigned by Crothall to Elmhurst Hospital until June 12, 2017. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 16:4-14.**

**RESPONSE:** Not disputed.

117. While at Elmhurst Hospital, Fonseca had the title of Assistant Director and was responsible for daily operations which with respect to management of housekeepers included

scheduling work, reporting incidents, attending meetings, training of housekeepers, counseling housekeepers, implementing disciplinary actions against housekeepers, recommending housekeeper suspensions, recommending firing of housekeepers and recommending housekeeper promotions. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 17:5-18:15.**

> **RESPONSE:** Disputed in part. Defendant does not dispute that Ms. Fonseca testified that her job duties included the above tasks, but Ms. Fonseca also testified that HHC and Crothall "worked together" and both "took care of" overseeing the housekeeping at Elmhurst, at which point Plaintiff's counsel repeatedly cut off the witness as she began to discuss HHC's involvement, told the witness repeatedly that Plaintiff's counsel was not intending to ask about HHC and was only asking about Crothall, and instructed the witness not to include information about HHC in response to the questions. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **13:7-20 and 18:4-21:7** (including a lengthy discussion between counsel as to the appropriateness of asking the witness to limit her answers so as to not include information about HHC, and Plaintiff's counsel making it explicitly clear that the questions are intended to only ask about Crothall and only seek answers discussing Crothall and not HHC). Ms. Fonseca later testified that HHC housekeeping supervisors also oversaw the work of HHC's housekeepers at Elmhurst, including at the time and location of Plaintiff's accident. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **82:9-25; 102:7-14.** Ms. Fonseca testified that HHC also provided training for HHC housekeeping personnel. **Exhibit 4** Depo of Yulieth Fonseca (Dated: January 9, 2018) at **86:26-87:4, 99:9-12.**

118.    Crothall provides all the equipment and supplies used by housekeeper to perform housekeeping at Elmhurst Hospital including but not limited to mops, disinfectants for mopping, bins and buckets for mopping, housekeeping carts and warning signs for wet floors. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 21:8-22:14, 56:8-58:2.**

45

**RESPONSE:** Not disputed to the extent that "provides" is intended to mean Crothall arranged for housekeeping supplies and equipment to be supplied at HHC's facilities under the HCC Contract. Crothall disputes that "all" supplies and equipment came from Crothall, as HHC's facilities had supplies and equipment prior to the HHC Contract that continued to be used. In addition, supplies and equipment were approved by HHC, HHC reimbursed Crothall for most anticipated purchases (up to a set amount), and ownership of supplies and equipment transfer to HHC after a set period of time. **Exhibit 5** HHC Contract **§§ 3.1(e), 3.1(k)(i) and 3.1(k)(ii); Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **81:25-82:13.**

119. Crothall "provides everything, in regards of the tools" used by housekeepers to mop floors at Elmhurst Hospital. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 22:4-14.**

**RESPONSE:** Not disputed to the extent that "provides" is intended to mean Crothall arranged for housekeeping supplies and equipment to be supplied at HHC's facilities under the HCC Contract. Crothall disputes that "all" supplies and equipment came from Crothall, as HHC's facilities had supplies and equipment prior to the HHC Contract that continued to be used. In addition, supplies and equipment were approved by HHC, HHC reimbursed Crothall for most anticipated purchases (up to a set amount), and ownership of supplies and equipment transfer to HHC after a set period of time. **Exhibit 5** HHC Contract **§§ 3.1(e), 3.1(k)(i) and 3.1(k)(ii); Exhibit 3** Depo of Richard Rossi (Dated: October 27, 2017) at **81:25-82:13.**

120. Crothall prepares the schedules for housekeepers including their vacations, overtime and when and where they work at Elmhurst Hospital. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 22:15-23:11, 58:3-16, 59:16-60:7.**

**RESPONSE:** Not disputed to the extent Crothall prepares the schedules, subject to the conditions set out by HHC.

121.   Crothall instructs, trains and directs each housekeeper on how to perform his/her duties at Elmhurst Hospital including mopping. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 23:8-17, 32:6-33:5.**

**RESPONSE:** Not disputed the extent that Crothall did so, but did not do so exclusively or to the exclusion of HHC personnel.

122.    To train housekeepers, Crothall conducts High Profile Cleaning ("HPC") training sessions twice a year. In groups of ten (10) housekeepers, Crothall instruct them about their responsibilities including how to mop a floor. Buckets are filled to a specified level. Prior to mopping, each housekeeper must place at least four (4) to five (5) wet floor signs in a hallway. There is a recommended distance for the placing of wet floor signs. If an entrance is being mopped, Crothall instructed housekeepers to place a wet floor sign in the door and to mop inside out. Housekeepers are also trained to not leave an area they have mopped until the floor is dry. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 36:15-39:21, 56:2-23.**

**RESPONSE:** Not disputed to the extent that Crothall instructs as to High Profile Cleaning and as to mopping, but hallway mopping is not High Profile Cleaning. In the cited testimony, the witness discusses two different types of activities.

123.    Crothall also provides each housekeeper with written directions for performing work in the form of a spreadsheet. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 39:18-21.**

**RESPONSE:** Not disputed to the extent the witness testified that spreadsheet was provided for High Profile Cleaning, not hallway mopping.

47

124.     At least once a month, Crothall requires housekeepers to participate in safety meetings conducted by Crothall. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 40:6-41:24.**

**RESPONSE:** Not disputed to the extent that the witness testified Crothall held monthly safety meetings. It is unclear from the testimony cited whom attended, and the testimony cited contains no statement as to whom "required" attendance.

125.     The monthly safety meeting is in addition to a daily "huddle" conducted by Crothall with all housekeepers to discuss safety. The daily "huddle" is conducted before sixty-five (65) housekeepers go to their assigned areas to perform work at Elmhurst Hospital. The "daily huddle" is also used to instruct housekeepers to make sure everything is perfect if the government is coming to the hospital. **Fonseca Deposition Excerpts Joint Appendix- Exhibit** 4 **at 41:25-43:6, 74:5-75:8.**

**RESPONSE:** Not disputed to the extent that Crothall has daily huddles, but disputed to the extent "conducted" is intended to mean that only Crothall managers speak or contribute at the huddles.  Ms. Fonseca testified that HHC housekeeping supervisors can also speak and contribute at the huddles.   **Fonseca Deposition Excerpts Joint Appendix- Exhibit** 4 **at 104:11-105:6; 107:17-21.**

126.     Crothall also prepares a "duty list" for housekeepers. The "duty list" is reviewed with housekeepers and it is maintained in Crothall's office at Elmhurst Hospital. The "duty list" details daily responsibilities for housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 67:25-69:23.**

**RESPONSE:** Not disputed to the extent that Crothall prepares the duty list subject to the conditions and approval of HHC. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 99:19-100:12.**

127. Fonseca stated that the "duty list" is a specific breakdown prepared by Crothall about when and what each housekeeper is required to do. Crothall goes over the duty list with each housekeeper. It includes "[w]hat do you do first in the morning. Seven a.m. you check on your housekeeping cart, make sure the tools are properly there, your spray bottles are labeled. You have enough supplies, paper towels. Then you start your routine checking the main entrances first, restrooms and then it goes around. It breaks it down by offices." **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 71:22-72:25.**

**RESPONSE:** Defendant does not dispute that duty list sets out general cleaning tasks for the day, subject to whatever changes or additional needs may come up during the course of the day.

128. Fonseca's typical day at Elmhurst Hospital started with checking the callout line to determine whether any housekeepers were not coming to work. Fonseca would then check the daily schedule to make sure each area of the Hospital was covered by a housekeeper. Fonseca would then inspect the 6th to 11th floors "to ensure [that] my housekeeper has the right tools. Ensure they have a wet floor sign. Mops, buckets, microfibers, dust pans, brooms, the right chemicals and that everything is labeled." **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 31:15-32:23.**

**RESPONSE:** Not disputed.

129.   Fonseca did this to make sure that her housekeepers were doing the right thing, properly carrying out their duties and directing necessary cleaning. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 32:9-23.**

**RESPONSE:** Not disputed to the extent that Ms. Fonseca was testifying as to her work, but Ms. Fonseca also testified she did not perform this work exclusively or to the exclusion of HHC personnel.  **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 102:19-103:24.**

130.   If Fonseca observed or was told that mopping or cleaning was not performed or incorrectly performed, she would direct housekeepers to perform or correct their work. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 33:6-34:3.**

**RESPONSE:** Not disputed to the extent that Ms. Fonseca was testifying as to her work, but Ms. Fonseca also testified she did not perform this work exclusively or to the exclusion of HHC personnel.  **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 102:19-103:24.**

131.   Fonseca would spend an hour on each of her floors. Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 34:4-16.

**RESPONSE:** Disputed in part.  In the cited testimony, the witness testified she "could" spend one hour a floor, depending on what was "going on."

132.   Crothall's employees responsible for other floors at Elmhurst Hospital would perform the same work Fonseca performed with respect to supervising and managing housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 35:2-36:8.**

**RESPONSE:** Not disputed.

133.   Bathrooms at Elmhurst Hospital are mopped early in the morning at least once a day by housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 54:2455:14.**

**RESPONSE:** Not disputed.

134.    Bathrooms are also mopped during the day as needed by housekeepers. Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 55:15-25, 67:17-23.

**RESPONSE:** Not disputed.

135.    On the first floor of Elmhurst Hospital bathrooms are supposed to be checked very five (5) to ten (10) minutes by the assigned housekeeper. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 62:21-63:4.**

**RESPONSE:** Not disputed to the extent that the witness was discussing the specific bathroom in the area of Plaintiff's fall and not any/all bathrooms on the first floor.

136.    No employee from HHC was ever on any floor with Fonseca to watch the housekeepers. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 79:21-80:2.**

**RESPONSE:** Disputed. The cited witness testimony does not support the statement. Ms. Fonseca testified HHC's housekeeping supervisors would not accompany Ms. Fonseca when Fonseca walked the floors 2-3 times per shift.  Ms. Fonseca clearly testified that HHC did have additional HHC housekeeping supervisors that also oversaw the housekeeping work on these same floors. **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 80:9-14; 82:9-25.**

137.    HHC employed supervisors who had the responsibility to make sure that there were supplies for the psychiatric floors (9, 10 and 11) at the hospital. The HHC supervisor, Sonya, reported to Fonseca from Crothall. Fonseca was Sonya's "boss" and "directed her." **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 80:3-82:8, 86:2-14.**

**RESPONSE:** Not disputed to the extent that HHC employed housekeeping supervisors whose work included the type listed, but this was not the only work HHC housekeeping supervisor's performed nor was "Sonya" the only HHC housekeeping supervisor.  Ms. Fonseca testified that each floor at Elmhurst had an HHC supervisor assigned to it and that HHC supervisors

51

also oversaw and direct HHC's housekeepers.  **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 102:7-103:18.**

138.    Sonya also reported problems to Fonseca. Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 86:15-20.

**RESPONSE:** Not disputed.

139.    HHC supervisors also attend the "daily huddles" run by Crothall.  **Fonseca Deposition Excerpts Joint Appendix- Exhibit 4 at 87:5-10.**

**RESPONSE:** Not disputed.

140.    Another HHC supervisor took direction from two additional employees (Guy Petriello and Jose Chevalier) of Crothall. **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 82:9-83:18.**

**RESPONSE:** Not disputed to extent that Petriello was an assistant director for that portion of the building, and Chevalier was the director overall.

141.    Crothall's "Duty List" for the date of the accident which would have evidenced the housekeeper who mopped the floor and/or was responsible for cleaning the hallway where Reyes fell was discarded by Crothall.on duty. **Rossi Deposition Excerpts Joint Appendix- Exhibit 2, 56:19-62:6.**

**RESPONSE:** Disputed in part.  The duty lists for 2015 were discarded in the ordinary course of business when the new duty lists were created.  Crothall did produce an attendance sheet listing the housekeepers that were working at Elmhurst on the day of the accident, including identifying the specific housekeepers assigned to work in this area of the first floor.  **Fonseca Deposition Excerpts Joint Appendix-Exhibit 4 at 61:4-62:20.**  Crothall was not notified of this

52

accident or wet floor until months after the fact, and HHC personnel could direct HHC housekeepers for perform such mopping without contacting Crothall.  **RSOF 38, 41, 42, 43.**

Dated: Uniondale, New York
        June 12, 2018

                                        WESTERMAN BALL EDERER
                                        MILLER ZUCKER & SHARFSTEIN, LLP


                                        By:  */s/*William E. Vita
                                             William E. Vita, Esq.
                                             1201 RXR Plaza
                                             Uniondale, NY 11556
                                             Telephone:516-622-9200
                                             Facsimile: 516-622-9212
                                             wvita@westermanllp.com
                                             *Attorneys for Crothall Healthcare, Inc.*

53