UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------X

DAISY REYES,

                Plaintiff,

                                           **MEMORANDUM AND ORDER**

      -against-                       17-CV-1003 (KAM)(VMS)


CROTHALL HEALTHCARE, INC.,

                Defendant.

--------------------------------------X

**MATSUMOTO, United States District Judge:**

          On January 12, 2017, plaintiff Daisy Reyes ("plaintiff" or "Reyes") brought an action against defendant Crothall Healthcare, Inc. ("defendant" or "Crothall") in state court, alleging that she was injured from slipping and falling on a floor left wet due to the defendant's negligence. (ECF No. 1-1, Verified Complaint at 5-7.) Defendant removed this action to federal court on February 22, 2017 under diversity jurisdiction. (ECF No. 1, Notice of Removal at 1-2.) Defendant subsequently moved for summary judgment. (ECF. No. 24, Notice of Motion for Summary Judgment.) For the reasons stated below, Crothall's motion for summary judgment is granted.

**BACKGROUND**

          The following facts are taken from the parties' Statements of Undisputed Facts Pursuant to Local Rule 56.1, as

1

well as the exhibits cited in and annexed to the parties' motion papers.

Plaintiff Daisy Reyes is a resident of Queens County, NY, and is a citizen of New York for diversity purposes. (ECF No. 1, Notice of Removal ¶ 5.) On August 31, 2015, Reyes slipped and fell while at work, inside a first-floor hallway at Elmhurst Hospital Center ("Elmhurst" or "the hospital") around 12:45 p.m. (ECF. No. 26-1, Defendant's Response to Plaintiff's Counter-Statement of Undisputed Material Facts ("CSOF Response") ¶ 1.) Approximately 15 minutes prior to the plaintiff's fall, she went to a restroom near the location of her fall; upon exiting, she noticed an unidentified, uniformed hospital housekeeper who appeared to be preparing to mop. (*Id.* ¶ 2.) Reyes testified that the hallway floor was wet after her fall, and she believes mopping was the cause because her dress was wet from the fall and smelled like cleaning chemicals. (*Id.* ¶ 3.) Reyes did not see a wet floor sign in the hallway when she fell. (*Id.* ¶ 4.) Reyes sought and received workers' compensation benefits based on this accident. (*Id.* ¶ 6.) After receiving workers' compensation, Reyes subsequently filed a complaint alleging one count of negligence against Crothall. (*Id.* ¶ 5.)

On the day she fell, Reyes was employed by the New York City Health and Hospitals Corporation ("HHC"). (*Id.* ¶ 6.) HHC is a governmental entity that, at the time of the accident,

owned and operated Elmhurst Hospital, where Reyes worked. (*Id.* ¶ 7.) Defendant Crothall Healthcare, Inc. is a Delaware corporation with a principal place of business in Pennsylvania. (ECF. No. 1, Notice of Removal ¶ 6.) Crothall had entered into a contract with HHC ("HHC Contract") to provide certain management services for HHC's Environmental Services program ("housekeeping" or "housekeepers") at HHC's facilities, including Elmhurst Hospital, and this contract was in effect at the time of the accident. (ECF. No. 26-1, CSOF Response ¶ 8; *see id.* ¶ 48.)

The housekeeping management services provided by Crothall are set out in the HHC Contract and include that Crothall will train, manage, and direct HHC Unionized Employees, in accordance with HHC's policies and procedures. (*Id.* ¶ 9.) The Contract further provides that the services performed by Crothall "shall be at all times subject to the direction and control of the Corporation [HHC]." (*Id.*) In the HHC Contract, HHC sets out the type and amount of housekeeping services to be performed at its facilities. (*Id.* ¶ 10.) Exhibit A-1 of the Contract describes 19 "cleaning specifications" that each set out multiple cleaning tasks to be performed in different parts of the hospital, as well as how often those cleaning tasks should be performed. (*Id.* ¶ 60.)

The housekeeping work itself, including mopping, is performed by unionized housekeeping workers employed directly by HHC. (*Id.* ¶ 12.) Under the Contract, HHC directly hires, employs, provides uniforms for, insures, and pays wages to those unionized housekeeping employees, and the selection and number of housekeepers is controlled by HHC. (*Id.* ¶ 13.)

There are approximately 153 housekeepers (approximately 65 per day shift) working at the hospital. (*Id.* ¶ 26.) HHC retained the authority to hire, fire, and formally discipline these unionized housekeepers and did not delegate that authority to Crothall, which can only submit proposals to and confer with HHC regarding staffing changes to be made by HHC. (*Id.* ¶ 13.) Crothall also could recommend the firing, discipline, retraining, or promotion of HHC housekeepers. (*Id.* ¶ 13, response.)

The HHC contract sets the number of Crothall personnel that are available to perform the management services at each facility. (*Id.* ¶ 14.) These Crothall managers do not perform the actual housekeeping duties. (*Id.* ¶ 21, reply.) At the time of the accident, Crothall had five managers on site who worked weekday shifts, but were not present for weekend or overnight housekeeping shifts. (*Id.* ¶ 23.) Yulieth Fonseca, a Crothall manager, would monitor the status of her assigned floors and provide instructions to housekeepers as needed. (*Id.* ¶¶ 127-

30.)  HHC also employed 8-9 additional housekeeping supervisors who also oversaw and directed housekeepers.  (*Id.* ¶ 24.)  These supervisors were present for all shifts.  (*Id.* ¶ 24.)  These HHC supervisors also reported to Crothall managers.  (*Id.* ¶ 24.)  Both HHC and Crothall personnel could direct housekeepers to perform work as needed however.  (*Id.* ¶ 33.)

Reports of wet floors could be directed to HHC personnel with or without notice to Crothall, and Crothall managers were not notified of every spill or wet floor.  (*Id.* ¶ 38.)  Routine cleaning of the floors typically occurred at night, but "spot" cleaning as requested or needed occurred during the day.  (*Id.* ¶ 32.)  HHC housekeepers also monitor areas for housekeeping needs and could address those needs when discovered without communication with Crothall managers.  (*Id.* ¶ 41.)

HHC and Crothall were required to work collaboratively to develop and implement the staffing plan.  In addition, the goal of the HHC Contract was to reduce the number of housekeepers employed by HHC through its involvement with Crothall, resulting in improved efficiency in performance of housekeeping services.  (*See id.* ¶ 13, response.)  Crothall created daily work assignments for housekeepers.  (*Id.* ¶ 98.)  Crothall prepared the schedules for housekeepers, including their vacations, overtime, and when and where they worked at the

hospital.  (*Id.* ¶ 120.)  Crothall also prepared "duty lists,"
which detailed daily responsibilities for housekeepers and were
reviewed with the housekeepers.  (*Id.* ¶ 126.)  But if a Crothall
manager wanted to remove an item from the duty list, HHC would
have to approve first.  (*Id.* ¶ 126, response.)  Crothall
provided housekeeping supplies and equipment, although some of
HHC's existing supplies and equipment were used and HHC
reimbursed Crothall for most purchases up to a set amount.  (*Id.*
¶ 103 & response.)  Crothall also furnished its proprietary
housekeeping software for the hospital's use.  (*Id.* ¶ 66.)

Crothall was responsible for providing and maintaining
training materials for use in training the HHC housekeepers.
(*Id.* ¶ 64.)  Crothall had its own Standard Operating Process
Manual ("SOP")[1].  (*Id.* ¶ 69.)  The purpose of the SOP was "[t]o
provide a blueprint for hourly associates to perform their daily
cleaning requirements and to ensure that the cleaning
specifications identified in the agreement are delegated through
written cleaning assignments."  (*Id.* ¶ 72.)  The SOP required,
among other things, that Crothall prepare biweekly schedules and
that housekeepers sign in and out daily.  (*Id.* ¶¶ 75-76.)  The

---

[1] In its responses in the CSOF, Crothall objects to facts citing the SOP,
pointing out that this manual is an internal guideline and claiming that it
has limited application for different contracts, facilities, etc.  The court
considers the SOP as a point of reference for how Crothall generally
operates, but does not adopt guidelines from the SOP as evidence of what
occurred in this case unless corroborated by other evidence in the record.

SOP required Crothall to follow a written procedure titled "Procedure 3.01: Quality Inspections & High Touch Surface Focus" at least two times each month with each housekeeper, as well as to conduct monthly training meetings for all housekeepers. (*Id.* ¶¶ 80,82.) The SOP also required mandatory annual training for housekeepers. (*Id.* ¶ 83.) A Crothall manager who worked at the hospital, Yulieth Fonseca, participated in a training based on the SOP when she was initially hired by Crothall. (*Id.* ¶¶ 111-12.)

Training of housekeepers was performed weekly, monthly, semi-annually, and annually. (*Id.* ¶ 101.) Crothall conducted High Profile Cleaning training sessions twice a year, during which groups of ten housekeepers were instructed on various cleaning tasks, including proper mopping protocol. (*Id.* ¶ 122.) Crothall also held monthly safety meetings and a daily "huddle," in which safety was discussed before the housekeepers started work in their assigned work areas. (*Id.* ¶¶ 124-25.) HHC supervisors attended the daily huddles. (*Id.* ¶ 139.) The HHC supervisors could also speak and contribute at huddles. (*Id.* ¶ 125, reply.)

At the hospital, HHC also maintained separate Maintenance (also referred to as Facilities), Security, and Safety departments, with which Crothall had no role or oversight, and HHC controlled the access of different personnel

to different parts of the facility through credentials and
security clearances.  (*Id.* ¶ 35.)

**LEGAL STANDARD**

**I.  Summary Judgment**

Summary judgment is appropriate where "the movant
shows that there is no genuine dispute as to any material fact,"
Fed. R. Civ. P. 56(a), "and the facts as to which there is no
such issue warrant the entry of judgment for the moving party as
a matter of law." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537,
545 (2d Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S.
317, 322–23 (1986).  "All ambiguities must be resolved in favor
of the non-moving party and all permissible inferences from the
factual record must be drawn in that party's favor." *Zalaski v.
City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir.
2010).  If the moving party can show that "there is no genuine
issue as to any material fact and that it is entitled to
judgment as a matter of law, the nonmoving party must come
forward with specific facts showing that there is a genuine
issue for trial." *Peterson v. Regina*, 935 F. Supp. 2d 628, 634
(S.D.N.Y. 2013) (citing *Matsushita Elec. Indus. Co. v. Zenith
Radio Corp.,* 475 U.S. 574, 587 (1986)).

To defeat a motion for summary judgment, the non-
moving party must identify probative, admissible evidence from
which a reasonable factfinder could find in his favor.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-257 (1986).  It
"requires the nonmoving party to go beyond the pleadings and by
[his or] her own affidavits, or by the depositions, answers to
interrogatories, and admissions on file, designate specific
facts showing that there is a genuine issue for trial."  477
U.S. at 261 n.2 (citations omitted).

     "Only disputes over facts that might affect the
outcome of the suit under the governing law will properly
preclude the entry of summary judgment. . . . [I]t is the
substantive law's identification of which facts are critical and
which facts are irrelevant that governs."  477 U.S. at 248.  If,
as to the issue on which summary judgment is sought, there is
any evidence in the record from any source from which a
reasonable inference could be drawn as to a material fact in
favor of the nonmoving party, summary judgment is
improper.  *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d
Cir. 1994)(citations omitted).

## DISCUSSION

     Crothall argues that it is entitled to summary
judgment for several reasons.  (*See* ECF No. 24-6, Memorandum of
Law in Support of Motion for Summary Judgment.)  Crothall's
first argument is that any claim arising from the negligence of
Reyes's co-worker, who was employed by HHC, is barred by the
exclusivity provisions of New York's Workers' Compensation Law

("N.Y. W.C.L."). Any negligence from a co-worker employed by HHC would be extinguished by the exclusivity provisions of the N.Y. W.C.L. and, therefore, cannot be imputed to Crothall. Crothall also argues that it did not owe Reyes, an HHC employee, an independent tort duty based on its contract with HHC.

Reyes argues that summary judgment should be denied because there are disputed issues of material fact relating to her claims. (*See* ECF No. 25-2, Memorandum of Law in Opposition to Motion for Summary Judgment.) Reyes claims that there are factual issues which, when resolved, will demonstrate that Crothall is liable for the negligence of the housekeepers because Crothall is a special employer of the HHC housekeepers. Reyes also claims that the HHC contract created a duty to Reyes, which Crothall violated by causing the accident.

After evaluating the parties' arguments and evidence, the court concludes that there are no disputed issues of material fact and that Crothall's motion for summary judgment shall be granted. To address the imputed negligence claim, the court begins by evaluating New York's Workers' Compensation Law and case law regarding special employment.

## I.  New York's Workers' Compensation Law

New York's Workers' Compensation Law entitles workers like Reyes to a statutory remedy (which she received) and limits the availability of additional remedies. Section 10 of the

statute provides that employers shall "secure compensation to [their] employees and pay or provide compensation for their disability or death from injury arising out of and in the course of the employment without regard to fault as a cause of the injury . . . ."  N.Y. Workers' Comp. § 10(1).  The liability of an employer described in Section 10 "shall be exclusive and in place of any other liability whatsoever, to such employee . . . or any person otherwise entitled to recover damages, contribution or indemnity, at common law or otherwise, on account of such injury or death or liability arising therefrom . . . ."  N.Y. Workers' Comp. § 11.  The New York Court of Appeals has also held that "[t]he sole and exclusive remedy of an employee against his employer for injuries in the course of employment is compensation benefits . . . ."  *Gonzales v. Armac Indus.*, 611 N.E.2d 261, 264 (N.Y. 1993).

Additionally, the "right to [workers'] compensation or benefits . . . shall be the exclusive remedy to an employee . . . when such employee is injured or killed by the negligence or wrong of another in the same employ . . . ."  N.Y. Workers' Comp. § 29(6).  The scheme behind workers' compensation is that "[f]ixed compensation is guaranteed to the injured employee regardless of fault and in exchange for reducing the costs and risks of litigation to the parties."  *See Gonzales* at 264.  The statute thus protects an injured employee, a co-worker who may

have caused or contributed to the injury, and the employer of the injured employee.

## II.  **Special Employer Status in General**

The Workers' Compensation exclusive remedy bar applies to an employee who is both a general employee of one employer and a special employee of another employer. *Thompson v. Grumman Aerospace Corp.*, 585 N.E.2d 355, 359 (N.Y. 1991).  A special employee is one who "is transferred for a limited time of whatever duration to the service of another."  *Id.* at 357. Effectively, in context of this action, the exclusivity bar prevents plaintiff, who has received workers' compensation from HHC, a general employer of plaintiff and the allegedly negligent HHC housekeeping employee, from bringing a lawsuit against Crothall if Crothall is determined to be the special employer of the allegedly negligent HHC housekeeping employee.

*Thompson* addressed the question of whether plaintiff Thompson, an employee hired by a company called ATS, was properly determined to be a special employee of Grumman as a matter of law in an earlier summary judgment ruling.  *Id.* at 355.  Thompson had previously received workers' compensation from ATS before bringing a negligence suit against Grumman.  *Id.* at 356.  In its defense, Grumman asserted that it was Thompson's special employer, and therefore Thompson was barred from a suit against Grumman.  *Id.*

The New York Court of Appeals held that Thompson could not sue Grumman because he was Grumman's special employee. *Id.* at 358-59. The court explained that "a general employee of one employer may also be in the special employ of another, notwithstanding the general employer's responsibility for payment of wages and for maintaining workers' compensation and other employee benefits." *Id.* at 356-57. "General employment is presumed to continue, but this presumption is overcome upon clear demonstration of surrender of control by the general employer and assumption of control by the special employer." *Id.* at 357.

Although categorization as a special employee is usually a question of fact, there is no per se rule that a question of fact always exists or that the question of special employment must go to a jury. *Thompson*, 585 N.E.2d at 357. "[T]he determination of special employment status may be made as a matter of law where the particular, undisputed critical facts compel that conclusion and present no triable issue of fact." *Id.*

Many factors may be weighed in deciding the issue of special employment, but no one factor is decisive. *Id.* at 357. Although not determinative, "a significant and weighty feature has emerged that focuses on who controls and directs the manner, details and ultimate result of the employee's work." *Id.* at

357-58.  *See also Forjan v. Leprino Foods, Inc.*, 209 Fed. App'x. 8, 10 (2d Cir. 2006) ("The factors to be considered in determining whether a special employment relationship exists include the right to control the employee's work, the method of payment, the furnishing of equipment, the right to discharge the employee, and the relative nature of the work.") (quotation omitted).  Furthermore, although "employers certainly may contract as between themselves to define their business relationships and accomplish their business objectives, an agreement between the employers may not be determinative of the issue of special employment."  *Thompson* at 358-59.

The *Thompson* court found that the court below had correctly determined that there was no material dispute of fact barring the conclusion as a matter of law that Thompson was a special employee of Grumman.  *Id.* at 358.  Although ATS, the general employer, was responsible for Thompson's pay and benefits, "all essential, locational and commonly recognizable components of the work relationship were between Thompson and Grumman."  *Id.*  ATS assigned Thompson to Grumman's plant exclusively on a full-time basis for the entire year leading up to Thompson's accident.  *Id.*  Thompson considered a Grumman supervisor to be his boss and reported daily to that supervisor only, who in turn regularly directed, instructed, assigned, supervised, and controlled his work duties.  *Id.*  The work

Thompson did was solely in furtherance of Grumman's business. *Id.* ATS could not reassign Thompson and only Grumman could terminate Thompson's assignment to Grumman, all of which prompted the court's finding that "ATS surrendered direction and control over Thompson to Grumman to perform the latter's work, and Grumman assumed and exercised that exclusive control." *Id.* The Court of Appeals ruled that "Thompson's receipt of workers' compensation benefits as an employee of ATS [was] his exclusive remedy and he [was] barred from bringing [a separate] negligence action against Grumman." *Id.* at 359.

III.  **Special Employment Status in Similar Cases**

Although *Thompson* establishes that receipt of workers' compensation from a general employer bars suit against a special employer, its fact pattern involved one company hiring an employee and sending that employee to work exclusively for, and under the supervision of, another company. By contrast, this case rests not on the personnel hired by Crothall and sent to HHC to jointly supervise HHC housekeeping employees, but on the conduct of a housekeeper who was hired by HHC and jointly managed and supervised by HHC and Crothall.

Crothall argues that it is not the housekeeper's special employer. Crothall further argues that Reyes would be barred from suing Crothall, even if Crothall were the housekeeper's special employer, because the housekeeper is a

15

general employee of HHC and is the plaintiff's co-worker for purposes of the workers' compensation statute. Reyes argues that Crothall is the housekeeper's special employer and is therefore liable for the negligence of its employee.[2] Both parties cite cases in their favor from New York state and federal courts with fact patterns similar to the one here, including several with Crothall or a related entity as a party. The court specifically reviews some of those cases below for the clarity they provide in this matter.

## A. Santorelli v. Crothall Services Group, Inc.

The plaintiff relies on *Santorelli v. Crothall Services Group, Inc.*, No. 15-cv-978, 2017 WL 728227 (E.D.N.Y. Feb. 23, 2017), another slip and fall case, in support of her position. As in this case, the defendants, all Crothall entities, claimed that nurse Santorelli's sole remedy for her injuries was workers' compensation and that Crothall was not the special employer of the housekeeper who failed to place a wet floor sign out after mopping. *Id.* at *1. Santorelli sought to avoid the workers' compensation exclusivity bar by arguing that

---

[2] Reyes claims that Crothall's discussion of workers' compensation as a bar to derivative negligence claims is "not germane to the motion," and does not address Crothall's contentions in much more detail. (*See* ECF No. 25-2 at 8, n.1.) Plaintiff's claim then seems to rely on Crothall's potential status as a special employer of the allegedly negligent HHC housekeeping employee, without regard to HHC's status as a general employer. In any event, under *Thompson*, the acts or omissions of the allegedly negligent HHC employee do not provide a basis for a separate negligence claim against Crothall.

the housekeeper, though technically an employee of the same health facility that employed the plaintiff, was not her coworker because he was Crothall's special employee. *Id.* at *4.

The court evaluated the responsibilities of and relationship between Crothall and the facility by reviewing provisions of their contract, as well as by considering deposition testimony that revealed how the parties interacted in reality. *Id.* at *2-*3. The court found that although Crothall did not pay the housekeeper's salary or provide his benefits, facts and inferences could be drawn to support either party on the other factors for determining special employment. *Id.* at *8. There was a lack of clarity regarding how the hiring/firing authority was actually employed, whose business interests the housekeepers' work served, and who ultimately controlled and directed the housekeepers' work. *Id.* at *7. Denial of summary judgment on this issue was therefore appropriate. *Id.*

In a footnote, the court also dismissed as "meritless" Crothall's argument that Santorelli was barred from suing Crothall, even if Crothall was the housekeeper's special employer, because the housekeeper was Santorelli's co-worker. *Id.* at *8, n.10. "Santorelli is limited to worker's compensation from [the health facility], but if Crothall is found to be [the housekeeper's] special employer under the principles of *Thompson,* then she can sue Crothall." *Id.*

## B. Collado v. Crothall Healthcare Inc.

The defendant relies on *Collado v. Crothall Healthcare Inc.*, 2017 WL 650230 (S.D.N.Y. Dec. 15, 2017) in support of its position. Plaintiff Collado, an HHC employee, brought a suit against Crothall after slipping and falling on a recently mopped floor that did not have a wet floor sign. *Id.* at *1. Crothall argued that workers' compensation was Collado's exclusive remedy and that Crothall did not otherwise owe a duty to Collado to keep the premises safe. *Id.* at *3.

The court examined how HHC and Crothall staff interacted with housekeepers to determine whether HHC clearly surrendered control to Crothall, and found that it did not. *See id.* at *4. The housekeeper involved in the accident and a Crothall supervisor both testified that the housekeeper's daily supervisor was an HHC employee. *Id.* at *4. The Crothall employees were hired to supervise the HHC supervisors generally, rather than the housekeepers. *Id.* All the standards, trainings, and materials that Crothall produced were approved by the hospital and/or co-created with HHC staff. *Id.* The housekeeper was "employed by, paid by, hired by, and supervised by HHC personnel." *Id.* The layer of supervision by Crothall employees was noteworthy, "but [did] not establish a material issue of fact as to whether HHC clearly demonstrated the surrender *Thompson* requires." *Id.*

18

Although the court recognized that there were many of the same facts at issue as in *Santorelli* and that the *Santorelli* court had found material issues of fact, the court distinguished *Santorelli* by noting that there was no evidence that Crothall had the power to discipline or recommend termination. *Id.* "Furthermore, there [was] clear and uncontroverted evidence that [the housekeeper] regularly reported to and was supervised by an HHS employee." *Id.*

### C. Oumentseva v. Crothall Facilities Mgt., Inc.

The defendant also relies on *Oumentseva v. Crothall Facilities Mgt., Inc.*, 2013 N.Y. Slip. Op. 31061(U) at 1-2, No. 105816/2009, 2013 WL 215582 (N.Y. Sup. Ct. May 13, 2013). In *Oumentseva*, a New York trial court considered Crothall's motion for reargument of a denied summary judgment motion and ultimately granted summary judgment. *Id.* at 1-2, 10. This case involved nurse Oumentseva's slip and fall claim. *Id.* at 2. The plaintiff claimed that the housekeeping staff either caused or failed to remedy the condition (liquid on the floor) that caused her to fall. *Id.* The court originally found that Crothall (and similarly positioned co-defendants) had failed to establish that the housekeepers in question were not their special employees and that the geriatric care facility controlled, assigned, supervised, and directed the housekeepers' work. *Id.* at 4.

Defendants claimed on re-argument that workers'
compensation was Oumentseva's exclusive remedy. *Id.* The court
stated that there was "no question that if defendant [could]
establish that [the housekeepers were] general employees of [the
facility], . . . the exclusivity provision . . . [would] bar any
further recovery by plaintiff." *Id.* at 5. Although the court
had previously held that there were questions of fact as to
whether the housekeepers were special employees, the more
pertinent question on re-argument was whether they remained
general employees. *Id.* at 6. The court pointed out that the
housekeepers were general employees because they were hired and
paid by the facility. *Id.* at 7. One housekeeper had actually
received workers' compensation payment from the facility in the
past. *Id.* The contract between Crothall and the facility also
"offer[ed] support that [the facility] did not surrender its
[cleaning] staff." *Id.* The contract stated that Crothall and
facility employees would follow the facility's policies and
procedures, and that the facility retained the right to remove
or replace employees. *Id.*

There were no disputed issues of material fact, as the
plaintiff had not pointed to any evidence suggesting that the
facility had surrendered control of its housekeepers to
Crothall. *Id.* at 8. Because the defendants established that

the housekeepers were Oumentseva's co-workers, the workers'
compensation law provided her exclusive remedy. *Id.* at 9.

## IV. Application of Workers' Compensation and Special Employment Law to Reyes's Case

Reyes cannot maintain a negligence action against
Crothall.  The text of New York's Workers' Compensation Law's
exclusive remedy provision bars suit against "another in the
same employ," without specific reference to or exceptions for
either general or special employment status.  *See* N.Y. Workers'
Comp. § 29(6).  On its face then, the statute seems to foreclose
a suit by Reyes, an HHC employee, against the allegedly
negligent housekeeper, another HHC employee.  Nonetheless, even
reading a general versus special employer distinction into this
provision, the court still concludes that Reyes's negligence
suit is barred by the N.Y. W.C.L.

As noted above and in *Santorelli*, the typical special
employment fact pattern involves one company loaning or
assigning its general employee to another company as a special
employee.  Special employment status in the usual case acts as a
shield for the putative defendant special employer, barring a
plaintiff's suit after the defendant has established that the
plaintiff is the defendant's special employee and has already
received the exclusive remedy of workers' compensation from the
general employer.  Here, the plaintiff seeks to use the

allegedly negligent HHC housekeeper's special employment status
as a means of seeing additional compensation from Crothall,
which has a relationship with the negligent actor, but which
cannot claim the plaintiff as its special employee as a defense.
Nonetheless, the ultimate issue in this case is not whether
Crothall is the HHC housekeepers' special employer, but rather
whether HHC is the housekeepers' general employer. Because the
undisputed facts demonstrate that there was not a clear
surrender of control by HHC over its HHC housekeepers, the
presumption that HHC is a general employer remains as a bar to
plaintiff's claim against Crothall.

Although Crothall managers were hired by HHC to manage
housekeeping services and did so jointly with HHC, Reyes has not
overcome the presumption of HHC's general employment of its
housekeepers because there is not a clear demonstration of
surrender of control by HHC and assumption of control by
Crothall. *See Thompson*, 585 N.E.2d at 357. Although Crothall's
managers were involved in managing the HHC housekeepers, HHC
supervisors also concurrently directed HHC housekeepers. The
housekeeper involved in Reyes's accident could not be
identified, but the undisputed record establishes that HHC
supervisors also played a role in managing the housekeeping
staff jointly with Crothall. Moreover, HHC supervisors were
also the only supervisors present to oversee the housekeepers

during night and weekend shifts, because Crothall employees were not working at the hospital during those periods. In addition to the HHC and Crothall cleaning supervisors, HHC employees in general could also give instructions to the housekeepers as needed.

Crothall may have provided regular training and instruction to the housekeepers, but the HHC contract bound Crothall ultimately to work in accordance with HHC's policies and procedures and "subject to the direction and control of [HHC]." Exhibit A-1 of the HHC Contract set out multiple, specific cleaning tasks that HHC expected its housekeepers to perform in different areas around the hospital and the minimal frequency with which the cleaning tasks were required to be performed. Although Crothall may have instructed HHC housekeepers on the manner of performing certain cleaning tasks or the days on which they were to be performed, Exhibit A-1 dictated the "ultimate result of the work" the housekeepers were required to perform. This is supported by testimony stating that although Crothall created the daily duty lists, it could not remove cleaning tasks from the list without consultation with HHC. (ECF No. 24-7, Joint Deposition Transcript Appendix, Exhibit 4: Deposition of Yulieth Fonseca at 118-19, Tr. 99:13-100-12.)

There is no evidence that Crothall played any role in hiring HHC housekeepers. That Crothall could only recommend firing, discipline, retraining, or promotion of HHC housekeepers also underscores that there was not a surrender of control by the general employer, HHC. Whether to comply with its union contract or for other reasons, HHC withheld from Crothall the ultimate decisionmaking authority regarding the employment status of the housekeepers. The power to recommend is not the power to act. But "[t]he power to fire, it is often said, is the power to control," and Crothall lacked that authority over HHC housekeeping employees. 5 Larson's Workers' Compensation Law § 61.08 (2018). HHC also hired the housekeepers and paid their wages.

The court respectfully disagrees with the conclusion in *Santorelli* regarding the importance of a housekeeper's status as the co-worker of an injured plaintiff. *See Santorelli* at *8, n.10. Because *Thompson* establishes that an employee can have both a general and special employer, and because Reyes cannot overcome the presumption of continued general employment by HHC in this case, New York law clearly bars her claim against the housekeeper here. The Workers' Compensation statute, "having deprived the injured employee of a right to maintain an action against a negligent coemployee, bars a derivative action which necessarily is dependent upon the same claim of negligence for

which the exclusive remedy has been provided." *Isabella v. Hallock*, 10 N.E.3d 673, 676 (N.Y. 2014) (citing *Rauch v. Jones*, N.E.2d 63, 65 (N.Y. 1958)). The New York Court of Appeals has rejected the general proposition that "derivative liability [can] never derive from an immune party's negligence." *See Tikhonova v. Ford Motor Co.*, 830 N.E.2d 1127, 1129 (N.Y. 2005). But the court has clarified specifically that the "statutory language mak[es] plain that in the special context of workers' compensation, the system of remedies provided by the Workers' Compensation Law supplants all other statutory or common-law causes of action." *Id.*

The facts established demonstrate that HHC did not surrender control of its housekeepers, even if Crothall was under contract with HHC to facilitate more efficient and effective housekeeping overall. Reyes's negligence claim against Crothall, based on the actions of a housekeeper, is therefore barred by the exclusive remedy provision of New York's Workers' Compensation law. Any remaining dispute of fact that may exist on this issue is not material because the exclusive remedy provision governs, and the outcome of this suit will not change. The court next considers whether any of Reyes's other claims survive.

## V.  Independent Tort Duty

The parties dispute whether Crothall is liable to Reyes under a tort theory for breach of an independent duty to Reyes. Under New York law, "a contractual obligation, standing alone, will generally not give rise to tort liability in favor of a third party." *Espinal v. Melville Snow Contrs.*, 773 N.E.2d 485, 487 (N.Y. 2002). However, there are three exceptions in which a party who has entered into a contract to render services can be said to have assumed a duty of care and face potential liability to third parties: "(1) where the contracting party, in failing to exercise reasonable care in the performance of his duties 'launche[s] a force or instrument of harm'; (2) where the plaintiff detrimentally relies on the continued performance of the contracting party's duties[;] and (3) where the contracting party has entirely displaced the other party's duty to maintain the premises safely." *Id.* at 488 (citations omitted). The plaintiff concedes that the second exception regarding detrimental reliance is not at issue here.

Regarding the first *Espinal* exception of launching a force or instrument of harm, a party who "undertakes to render services and then negligently creates or exacerbates a dangerous condition may be liable for any resulting injury." *Espinal* at 489. Although Crothall entered into a contract to render supervisory services relating to HHC's housekeeping employees, none of Crothall's managers actually cleaned the hospital

themselves and therefore could not have launched any force or instrument of harm. Reyes's claim then relies upon the court finding that the unidentified HHC housekeeper launched a force or instrument of harm and that the acts or omissions of that HHC employee should be imputed to Crothall. But the housekeeper's liability to Reyes is extinguished by the Workers' Compensation Law and therefore cannot be assigned to Crothall. Consequently, Reyes does not have a claim under the first *Espinal* exception.

As for the third *Espinal* exception, to show the existence of a duty on the part of a contracting party, the contract between the party and a property owner must constitute a comprehensive and exclusive set of obligations which the parties could have reasonably expected to displace the owner's duty to maintain the premises safely. *Hagen v. Gilman Mgt. Corp.*, 770 N.Y.S.2d 890, 891 (N.Y. App. Div. 2004). Evidence that the property owner reserves to itself a significant amount of control over maintenance of the premises suggests that a contracting party does not have a comprehensive agreement that displaces the responsibility of the owner such that the contracting party could be liable. *See id. See also Doona v. OneSource Holdings, Inc.*, 680 F. Supp. 2d (E.D.N.Y. 2010) (finding that a contractor's agreement to provide janitorial services did not wholly absorb the premises owner's

responsibility to maintain its premises, even if the premises were limited to the restrooms where the accident occurred).

Crothall cannot be said to have displaced HHC in the latter's duty to maintain the premises safely. Crothall's contract related solely to the supervision of cleaning services provided by HHC employees. In addition to ensuring the hospital was clean, HHC took other actions to maintain its premises in a safe and sanitary condition through its separate maintenance, security, and safety departments. Moreover, as the court has already found, HHC did not surrender control of cleaning oversight and implementation to Crothall. Reyes cannot find relief under the third *Espinal* exception.

## CONCLUSION

For the foregoing reasons, the court grants Crothall's motion for summary judgment. The Clerk of Court is respectfully directed to enter judgment in favor of the defendant and close the case.

**SO ORDERED.**

Dated:      March 5, 2019
             Brooklyn, New York

/s/
_____
**HON. KIYO A. MATSUMOTO**
United States District Judge
Eastern District of New York
